## AMERICAN BENTONITE CORPORATION et al. v. CLARK EQUIPMENT CO.

District Court, W. D. Michigan, S. D.

Nov. 24, 1928.

Frank E. Liverance, Jr., of Grand Rapids, Mich., and Chindahl, Parker & Carlson, of Chicago, Ill., for plaintiffs.

Rice & Rice, of Grand Rapids, Mich., and Wilkinson, Huxley, Byron & Knight, of Chicago, Ill., for defendant.

RAYMOND, District Judge.

The substantial question presented by the motion by Sialco, Inc., to strike its name as a party plaintiff from the bill of complaint and the motion to dismiss filed by the defendant, is whether a certain agreement of April 3, 1928, and conversations of the same date, resulted in the present granting of a license for the exclusive use of a patent, or whether the agreements then made contemplated that a formal license agreement should later be entered into as a condition precedent to the taking effect of the contract. The principles of law to be applied to such a situation were well stated in the case of Mississippi Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 1066, 41 Am. St. Rep. 545, in the following language:

"If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument, and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed. In determining which view is entertained in any particular case, several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

It appears from the evidence that serious controversies had arisen among the original incorporators of the American Bentonite Corporation, a New York corporation, and that, after a conference lasting three days, the agreement above referred to (Exhibit 2) was entered into. Paragraph 6 of that agreement, around which the present controversy centers, is as follows:

"It is further understood and agreed by and between the undersigned parties, certain being the holders of a patent which covers the use of bentonite in molding sands that they will at a time to be designated enter into a certain contract for license for the exclusive use of said patent for such molding sands for the life of said patent on the following terms and conditions to O. W. Smith and J. Benjamin Ott and or the new American Bentonite Corporation. Royalty consideration of same shall be paid to the undersigned owner, their successors, etc. by said J. Benjamin Ott and O. W. Smith and or the new American Bentonite Corporation of $1. per ton for the first year, that is from the first day of April 1928 to the first day of April 1929, on all bentonite sold under said patent for use in molding sands and the sum of $2. to be paid as a royalty on said patent from April 1, 1929 to the expiration of said patent. It is further understood that there will be a minimum sale of bentonite during the second year of said contract of not less than 2500 tons, the third year 4000 tons, the fourth year 5000 tons, the fifth year 6000 tons, sixth year 7000 tons on which the $2. royalty referred to will be paid by O. W. Smith and J. Benjamin Ott and or the new American Bentonite Corporation."

If this paragraph and the conversations referred to constitute an exclusive license under the patent owned by Sialco, Inc. (which is the corporation successor, by reason of change of name, to American Bentonite Corporation, a New York corporation, a corporation having been organized under the laws of Illinois subsequent to the agreement of April 3, 1928, under the name of American Bentonite Corporation, which corporation is one of the plaintiffs herein), there can be little question that the licensees are entitled to bring suit for its protection and to join the owner of the patent as a party plaintiff without its consent. See Independent Wireless Co. v. Radio Corporation of America, 269 U. S. 459, 46 S. Ct. 166, 70 L. Ed. 357.

Were the provisions of paragraph 6 solely to be regarded in determining the question of the intent of the parties, it seems clear that they contemplate the later execution of a formal contract and one more complete in detail. A mere reference to a future formal contract, however, does not of itself negative the existence of a present contract, though it is a matter to be taken into account in construing the evidence and determining whether the parties have really come to a final agreement or not.

In the present case the subsequent conduct of the parties is helpful in determining their intent. It appears that on the afternoon of April 3d, after the execution of Exhibit 2, a discussion lasting several hours ensued, the subject being the bringing of patent suits against supposed infringers, with especial reference to the questions of who might bring such suits, the payment of expense thereof, the repayment of royalties in event the patent should be declared invalid, and kindred matters. Such conclusions as were reached did not take contract form. Beginning April 10, 1928, and ending on May 19, 1928, the parties were frequently in com---

394

munication, either by correspondence or personally, with reference to the consummation of a license agreement. The letter of April 30, 1928, addressed by the attorney for the proposed licensees to Charles E. Kraus, the original patentee, indicates the apparent belief of the proposed licensees that a formal license agreement was important prior to the issuance by them of sublicenses. The letter is as follows:

"Mr. Charles E. Kraus, Kraus Research Laboratory, 110 East 40th Street, New York, N. Y.

"Dear Mr. Kraus: Since receiving the Corporation's withdrawal for Illinois, we have made considerable progress, but now face another situation which should be given attention as promptly as possible, namely, issuing of Licenses to the users of Bentonite.

"Will you, therefore, use your efforts with the New York Attorneys to expedite the contract under the Patent, as we will be ready within the next two or three days to make final arrangements in this regard, but we should, of course, have an opportunity to examine the contract etc.

"We will greatly appreciate you forwarding the proposed contract, at your earliest convenience.

"Your very truly yours,
"C. W. Smith Jr."

Failing to agree upon a formal license agreement by correspondence, the parties met in New York City on May 18th and 19th, at which time futile efforts were made to arrive at an understanding. Both parties submitted formal proposed license agreements consisting of approximately fourteen pages each. Neither party at any time suggested or proposed the execution of a formal contract in substantial accordance with paragraph 6. These facts indicate the belief of both parties to the contract that it was of that class usually found in writing; that it was of a nature requiring a formal writing for its full expression; that it had many details; and that the term of the contract was sufficiently long; and the amount involved was sufficiently large to warrant a carefully prepared contract. It is apparent that the contract of April 3d is incomplete as to many of the important elements commonly a part of license agreements. There is no provision determining territorial limitations, upon whom the burden of sustaining the patent rests, the effect of total or partial invalidity upon royalties already paid, the time for payment of royalties, the effect of nonpayment, and the right of licensees to grant sublicenses. The

fact that the execution of a formal license agreement was rendered impossible by the later insistence of both parties upon the insertion of conditions and provisions not contemplated in the contract of April 3d suggests strongly that terms deemed material by both parties were not then agreed upon and that both parties so understood. The inference to be drawn therefrom is that the minds of the parties had met on some but not on all matters deemed material. Had plaintiffs (other than Sialco, Inc.) on May 18th and 19th asserted their right to a contract embracing only the terms contained in the formal contract, a different case would be presented. In the case of Boysen v. Van Dorn Iron Works, 94 App. Div. 95, 87 N. Y. S. 995, 997, it was said:

"As already suggested, the proposition and acceptance, considered independently, were adequate on their face to form a valid agreement, in that they indicated the parties had intended a definite final understanding. The circumstances shadowed forth in the correspondence, however, denote that each party regarded some other material fact essential to the completion of the agreement. Neither party relied solely upon the proposition and acceptance as comprising the ultimate result. Each desired a bond, on the one hand, guarantying the faithful performance of the work, and, on the other, assuring payment upon performance, or security, in some acceptable manner, that payment was reasonably certain to be made. Each party was insistent upon the importance of the provisions of the character mentioned. The plaintiff did not offer to perform the agreement as contained in the proposition and acceptance, treating those as the sole agreement, but he apparently regarded other propositions to be determined upon between them necessary to the consummation of their contract, and an 'understanding' on these 'complications' was requested 'before executing a contract for this material.' The parties therefore coincided in the conclusion that the proposition and acceptance were tentative and subject to substantial modifications, and we must construe them in the light of the meaning given by the parties."

It seems clear to the court that the implications from the conduct of the parties as heretofore outlined are not materially lessened by the fact that plaintiffs (other than Sialco, Inc.) sold bentonite and granted sublicenses with the knowledge of Sialco, Inc., following the agreement of April 3d. This was done at a time when both of the parties believed that a formal license agreement would shortly be entered into; and, as indicat-

ed by the letter of April 30th, above quoted, there was at the same time an apparent recognition of the necessity for such a license. Sialco, Inc., refused to accept royalties upon the bentonite sold, and received no benefit from such transactions.

The burden of proof is on the party claiming that the contract was complete. 6 R. C. L. 619. The acts of the party claiming that the earlier negotiations resulted in a complete contract should be consistent with its existence. It should be clearly understood that the question here presented is not whether the agreement to enter into a contract at a later date may be specifically enforced. Unless it is reasonably clear that the parties intended their former negotiations to constitute the contract between the parties, this court ought not to take jurisdiction, but should await the determination of a court of competent jurisdiction in a suit for specific performance. Such a suit would present substantially different issues from those here considered. The sole question to be considered and determined is whether, on April 3d, a license agreement was actually consummated. It is the view of the court it was not. Appropriate orders will be entered granting the motion to strike and the motion to dismiss.