498

FINLEY et al. v. ASPHALT PAVING CO. OF
ST. LOUIS.
No. 9760.

Circuit Court of Appeals, Eighth Circuit.
Feb. 19, 1934.

Lawrence C. Kingsland, of St. Louis, Mo. (John D. Rippey and John H. Cassidy, both of St. Louis, Mo., on the brief), for appellants.

Lambert E. Walther, of St. Louis, Mo. (Philip C. Wise and Delos G. Haynes, both of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and BOOTH, Circuit Judges.

WOODROUGH, Circuit Judge.

Sam E. Finley, the owner, and the National Fin-Mix Corporation, an exclusive licensee in a certain territory of patents covering apparatus for and method of preparing bituminous cement aggregate composition, as plaintiffs, brought this suit for alleged infringement of the patents in the usual form against Asphalt Paving Company of St. Louis, defendant. The defendant in its answer pleaded, among other things in bar, a license by contract and estoppel. A motion for advance trial, under Equity Rule 29 (28 USCA § 723), on the defense of license having been sustained, a separate trial on that issue was had, resulting in a decree by the District Court holding that the defendant was a licensee under the patents in suit and, therefore, had not infringed upon any of the rights of plaintiffs under the patents. The court made extensive findings of fact and conclusions of law, and entered its decree that the bill of complaint be dismissed at the plaintiffs' cost. The plaintiffs appeal and present forty-seven assignments of error.

The court found upon the evidence before it:

That plaintiff Sam E. Finley is the owner and patentee of United States letters patent Nos. 1,462,904, and 1,522,431; that National Fin-Mix Corporation is and was at all of the times herein mentioned an exclusive licensee under the said patents, with certain territorial limitations, and with the right to sublicense the said patents.

The charter of the city of St. Louis provides for the letting of public work, including paving, to the lowest responsible bidder, and the board of public service of that city was the official administrative body having the duty of defining specifications for paving to be paid for in whole or in part by special assessment against private property; and that prior to April 10, 1931, there were only two mixers constructed under the letters patent installed in St. Louis, one being in the plant of the Central Paving Company, whose stock was controlled by the same person who had

control of the stock of the plaintiff National Fin-Mix Corporation, and the other in the plant of the Bridges Asphalt Paving Company. That there were nine responsible contractors engaged in the asphalt street paving business under contracts let by the city at the time.

7. The plaintiffs wanted to have the board of public service adopt the exclusive specification of asphalt paving materials mixed in a mixer and according to the process described in the plaintiffs' letters patent, and solicited defendant and other asphalt paving contractors in the city to assist the plaintiffs to secure the adoption of such exclusive specification of their mixer and process.

8, 9. The board having invited all the responsible asphalt paving contractors in the city to attend a hearing on the question of the adoption of such specification, the plaintiff corporation and the defendant met, and the plaintiff corporation represented to the defendant that if it would co-operate with the plaintiffs and the said specifications were adopted by the city of St. Louis, defendant could procure from plaintiff corporation a mixer and the right to use the process upon the payment of a deposit of $2,250 when the mixer was ready for delivery, and a rental or royalty of 40 cents per ton for the first fifteen thousand tons and 25 cents per ton for the subsequent amount of mixture prepared on said mixer, the said deposit to be absorbed by a refund or a deduction of 15 cents per ton on the price of the first fifteen thousand tons, and that such mixer could be furnished within five weeks.

10. The defendant advised that it would not lend its co-operation and assistance in securing the adoption of such specifications unless it was assured that it could obtain the mixer on the terms represented, and demanded that the assurance be reduced to writing, whereupon, the writing was signed and delivered by the corporation to defendant on April 9, 1931, the writing being as follows:

"Mr. L. J. Stiers,
"President Asphalt Paving Co.,
"St. Louis, Mo.
"Dear Sir:
"Confirming our verbal conversation of even date we hereby propose to furnish you with five ton rotary pressure type asphalt mixer on the following terms:
"40¢ per ton for the first fifteen thousand tons and 25¢ ton for every ton of material mixed by said mixer thereafter.
"When said mixer is ready for delivery, a deposit of $2250.00 shall be made with the National Fin-Mix Corp., which amount will be credited to your account and you may deduct 15¢ per ton from payments until such time as said $2250.00 has been absorbed.
"The above terms will be set forth in a uniform contract if you desire to use this process.
"Yours very truly,
"National Fin-Mix Corp.,
"By C. L. Newbold, Vice-President
"CLN:DC
"P. S. It will take approximately five weeks for delivery on the above mixer.
"C. L. Newbold."

11. The defendant had, less than two years previously, erected a new asphalt paving mixture plant with a so-called "pug-mill" at a cost of about one hundred thousand dollars, and as the city specifications had previously permitted the use of either pug-mill type mixture or rotary pressure mixture, all of the asphalt paving contractors had been on an equal footing in competition on city work so far as the kind of mixture was concerned, and had competed successfully with the Central Paving Company and Bridges Asphalt Company, using the Finley rotary pressure mixer.

12. After the plaintiff corporation and the defendant had come to their understanding and defendant was assured that it could obtain the plaintiffs' mixer and method, and on April 10, 1931, the board of public service had its hearing on the question of the adoption of exclusive specifications of plaintiffs' mixer and process. The members of the board knew at the time and the president of the board announced that only the two plans referred to were equipped to comply with such an exclusive specification and that the other seven responsible contractors were not.

13. The purpose of the hearing before the board was to satisfy the board as to two points: (1) That the adoption of the proposed specification and the letting of contracts thereunder would not result in increased cost to the taxpayers; and (2) that the competitive bidding system would not be interfered with. Representatives of the companies which had the plaintiffs' mixer stated that the exclusive specification would not result in increased cost of paving work. The other contractors were asked by the president of the board whether, under the exclusive specification, they would be as free to bid in competition in street paving work as theretofore. One of them who owned a large asphalt plant erected at a cost of $85,000, equipped

with a pug-mill mixer, made answer: "That is what they (plaintiff corporation) told me." The defendant, being called on, said: "The thing we are concerned in of course, is the question of competition." And being asked, if in the event the board adopted the specification his company would be free to bid on the specification, he replied: "Yes, I have been told we would, because we have been assured we could receive one of those mixers." Being further pressed to answer whether as an independent bidder his company would be free to bid competitively on the work, he said: "At the present time we would; yes, because of the fact that we have been assured, as I have stated, by the mixer people, we could have one of the mixers or they would arrange to secure asphalt from another plant at our cost." Other independent contractors at said hearing answered that they felt they would be free to bid if they could get one of the mixers. The representatives of the plaintiff corporation, present at the hearing, heard these statements by the president of defendant corporation and representatives of the other independent contractors.

Inquiry was made at the hearing into the cost of alterations in the plants of the independent contractors for installation of a Finley mixer, and the information was elicited by the president of the board that the cost would run from $6,000 to $8,000, which cost could be amortized over a period of years at the rate of 10 per cent. per annum.

That the board of public service, by the representations so made in said hearing with the approval of the plaintiff corporation, was led to believe and did believe that the plaintiffs would furnish to any of said contractors a mixer on a basis that would not increase the cost of the paving to the taxpayers and which would leave the individual contractors as free to compete with the Central Paving Company and the Bridges Asphalt Paving Company as they had been under the then existing alternative specifications for street paving work, and that the independent contractors would be able to obtain a license to use the mixer for an unlimited number of years and thus be enabled to amortize the cost of altering their plants to install a rotary pressure mixer over a sufficient period of time so as not to add to the cost of street paving work as would result if such expenditure had to be charged off in the year in which it was incurred.

The board of public service by the said representations was also induced to believe

and did believe that until defendant, or any other independent contractors, installed a Finley mixer in its own plant, the plaintiff would supply defendant and any other of said contractors with asphalt mixture complying with said specifications at a price no higher than it would cost the defendant, or any other such independent contractor, to produce such material with a mill at its own plant.

That in reliance upon the said representations made by plaintiff corporation to defendant and other contractors as reported to said board at said meeting in the hearing of and without contradiction from the representatives of plaintiff corporation as aforesaid, the said board of public service believing that the said specification would not result in increase in cost of asphalt street paving and that free competition would not be interfered with did on May 5, 1931, adopt as an exclusive specification for asphalt street paving that the asphalt mixture for such work should be prepared in a sealed rotary mixer with an appliance for adding the asphalt cement in a fine spray under pressure to the aggregate in the mixer. That said specification cannot be complied with except by use of a mixer of the type of the Finley mixer.

14. That on or about April 20, 1931, plaintiff corporation and defendant entered into a contract in writing, as follows:

"April 17, 1931.
"National Fin-Mix Corporation,
    "1406 Ambassador Building,
    "St. Louis, Missouri.
        "Attention—Mr. C. L. Newbold,
            Vice-President.
"Gentlemen:

"We are in receipt of your letter of April 9th confirming our verbal conversation of the same date, in which you propose to furnish, for our use, a five-ton rotary asphalt mixer for mixing asphalt materials by the Fin-Mix process, at such time as the process is specified in future work by the City of St. Louis.

"The terms of rental set forth are hereby accepted by us. With the adoption of said specifications by the City of St. Louis, you may enter our order. It is our understanding that delivery of the mixer is to be made within five weeks from said date.
        "Yours very truly,
            "Asphalt Paving Company,
"LJS:CLB        By L. J. Stiers, President.
"April 20, 1931.
"Accepted, National Fin-Mix Corporation, by
            C. L. Newbold, Vice Pres."

—the same consisting of a written offer from defendant to plaintiff corporation dated April 17, 1931, and an acceptance of said offer endorsed thereon and executed by plaintiff corporation. That by said contract plaintiff corporation agreed to furnish defendant for its use a five-ton rotary asphalt mixer for mixing asphalt materials by the Fin-Mix process at such time as said process should be specified in future work by the city of St. Louis, at the terms of rental set forth in the plaintiff corporation's letter of April 9, 1931, viz., 40 cents per ton for the first 15,000 tons, and 25 cents per ton for every ton of material mixed by said mixer thereafter, a deposit of $2,250 to be made when the mixer should be ready for delivery and said amount to be credited to its account and to be absorbed by deduction of 15 cents per ton from such rental payments; the defendant's order for the mixer to be entered with the adoption of said specification by the city of St. Louis and the delivery of the mixer to be made within five weeks from said date. That the said specification of time of delivery was of the essence of the contract. That the sentence in the letter of April 9, 1931, "The above terms will be set forth in a uniform contract if you desire to use this process," was not carried into and did not become part of the contract made up of the letter of April 17, 1931, and the acceptance thereof. That the said language, even if considered as part of the said letter of April 17, 1931, and the acceptance thereof was not by the parties intended to postpone the immediate taking effect of the contract, but merely manifests an intention to prepare and adopt a written memorial of the terms agreed upon. That the said letter of April 17, 1931, and the acceptance thereof on April 20, 1931, is a complete and definite contract.

15. That defendant bid upon and was awarded by the city of St. Louis contracts for paving work under said specifications, the first letting under said specification being on May 9, 1931, and defendant entered into contracts with said city for said work, to be performed within the limits of time fixed by said contracts respectively and gave bonds for the faithful performance of said contracts and the doing of said work in accordance with such specification. That defendant bid on said work and entered into said contracts in reliance upon the representations made by plaintiff corporation as to the furnishing and use of a mixer as hereinbefore found. That the plaintiffs knew that defendant bid upon said work and entered into said contracts with the city of St. Louis in reliance upon its contract with said plaintiff and upon the representations made by plaintiffs aforesaid.

16. That after the adoption by the city of St. Louis of the said specification and the awarding of a contract thereunder to defendant, defendant in writing dated May 14, 1931, placed its order with plaintiff corporation for a mixer. The said writing being as follows:

"Kindly place our order for one rotary mixer as outlined in your letter of April 9, 1931, which proposition was accepted by us in our letter of April 17, 1931, and advise us when this machine is ready for shipment.

"Please acknowledge receipt of our order and also advise what time we may expect shipment."

17. That plaintiff corporation did not furnish defendant with a mixer within the time of five weeks provided in the contract, and under date of July 11, 1931, defendant notified plaintiff corporation in writing of the default and called upon plaintiff corporation to account to defendant for such breach of its contract.

18. That thereafter on July 13, 1931, plaintiff corporation delivered to defendant a form of proposed contract (Defendant's Exhibit 8). That said proposed uniform contract was for a limited period of one year with privilege of renewal for an additional year, included in addition to the rental specified in the contract Defendant's Exhibit 5, a charge for engineering and inspection services, provided that the licensor should have supervision over the work done by licensee and the power to condemn and require to be taken up work done by the licensee, irrespective of the acceptance of such work by the city and contained other terms and provisions which would have placed burdens upon the licensee preventing free competition under said city specification, and which provisions were not within the terms of the contract under the defendant's offer of April 17, 1931, and plaintiff corporation's acceptance thereof on April 20, 1931. That said proposed contract was not a uniform contract within the meaning of that term as used in the letter of April 9, 1931, Defendant's Exhibit 4. That on July 17, 1931, defendant returned the said proposed uniform contract to plaintiff corporation and informed plaintiff corporation that defendant was standing upon its contract as embraced in said letters.

19. That on August 14, 1931, defendant notified plaintiff corporation in writing (Defendant's Exhibit 10) that, as plaintiff had failed to make delivery of the mixer within

502

five weeks from the date of the adoption of the specification, defendant was forced to buy asphalt mixture to complete its contracts with the city of St. Louis within the periods of time specified in said contracts. That in reply, plaintiff corporation on August 15, 1931, wrote defendant that delay in delivery was due to the fact that plaintiff corporation wanted to be assured that the blades of the mixer were perfect that this had caused considerable delay; that plaintiff had started assembling the drum of the mill and had ordered all parts and that they were staying right after the manufacturer and sincerely hoped that they would be able to deliver the same within the next ten days or two weeks. That there had been no negotiations between plaintiff corporation and defendant between July 17 and August 15, regarding a uniform contract.

20. That plaintiff corporation failed to deliver the mixer to defendant within the time promised in said letter of August 15, 1931. That thereafter from the early part of September, 1931, until about the middle of October, 1931, there were negotiations between plaintiff corporation and defendant for compromise and settlement of the controversies growing out of the failure of plaintiff corporation to deliver said mixer, but no settlement was effected. That the efforts to agree upon modification of the contract form submitted by plaintiff to defendant on July 13, and which had been rejected July 17, were part of said negotiations of compromise. That plaintiff corporation about the middle of October, 1931, definitely informed defendant that it would not furnish defendant a mixer.

21. That defendant did demand of plaintiff corporation the delivery of a Finley mixer and did make legal tender to plaintiff corporation of the sum of $2,250, being the amount of the deposit mentioned in the contract between the parties as hereinabove found, which tender plaintiff corporation refused and declined to accept.

22. That plaintiff corporation defaulted in its contract obligation to furnish a Finley mixer for defendant's use, and upon such default defendant, in order to enable it to fulfil its contracts with the city of St. Louis and in order to enable it to bid competitively on public street paving work under the specification adopted by the city of St. Louis as aforesaid, did have constructed for its use a mixer of the type required by the said specifications. That defendant had said mixer so acquired by it installed in its plant in the city of St. Louis. That the cost of procuring said mixer and the cost of alterations in defendant's plant for the installation of said mixer was approximately $9,000. That defendant has prepared materials in said mixer for its contracts with the city of St. Louis under the specification aforesaid. That defendant has tendered to plaintiff corporation the rental or royalty for the use of a Finley mixer and process for materials mixed by defendant in said mixer at the rate per ton specified in its contract with plaintiff corporation as hereinbefore found, but plaintiff corporation has refused to accept the said tenders.

23. That by reason of the conduct of the plaintiff as shown in the evidence and as hereinabove found, plaintiffs are estopped to deny that defendant has a lawful license to use the said Finley mixer and practice the said Fin-Mix process.

24. That plaintiffs by reason of their conduct as shown by the evidence and as here before found, are not entitled to equitable relief.

The court also made its conclusions of law, as follows:

1. The letter of April 17, 1931, and plaintiff corporation's acceptance thereof dated April 20, 1931 (Defendant's Exhibit 5) constitute a completed contract.

2. That the language in the letter of April 9, 1931, "The above terms will be set forth in a uniform contract if you desire to use this process," is not incorporated in the contract made up of the letter of April 17, 1931, and the acceptance thereof.

3. That even if said clause in the letter of April 9, 1931, be considered as incorporated in the contract made up of the letter of April 17, and the acceptance thereof, it was not intended by the parties to be made a condition to the existence of the contract.

4. That the said letter of April 17, the acceptance thereon dated April 20, 1931, and the order of May 14, 1931, constitute a license contract authorizing defendant to use the Finley mixer and process.

5. That the failure of plaintiff corporation to furnish defendant a mixer under the terms of said contract gave defendant the right to procure elsewhere a mixer of the pattern of the Finley mixer and to use the same in the exercise of the process.

6. That plaintiffs are estopped by their conduct from denying that defendant has a license under the said patents and from maintaining this suit.

7. That plaintiffs' acts and conduct precludes them from equitable relief herein.

8. That the defendant has a license to use and practice the alleged patented device and process and such license is a bar to plaintiffs' action for alleged infringement.

9. Under the law and the facts the finding must be in favor of defendant and against plaintiffs on the issue of license or no license.

In the brief of the appellant the numerous assignments of error are boiled down in five points, and the argument is directed mainly to two inquiries: (1) Whether there was a completed license contract, and (2) whether the plaintiffs, by their conduct, are estopped to deny that defendant had a license.

On consideration of the whole record it is apparent that many of the circumstances and facts relate directly to both inquiries; as they tend to show a meeting of minds upon a license contract, they also tend to show the necessary elements of estoppel in pais.

The situation presents certain analogies to that ruled on by the Supreme Court in De Forest Co. v. United States, 273 U. S. 237, 47 S. Ct. 366, 367, 71 L. Ed. 625. That was a patent infringement case in usual form. In that case, as in this one, there had been manufacture and use of patented articles and license was pleaded. The court had to decide whether a patent infringement suit would lie. There, as here, no elaborated licensing contract had been drawn up. There were abbreviated writings as in this case.

More particularly, it there appeared that the United States, being engaged in war, informed the American Telephone & Telegraph Company that it desired to have made promptly large numbers of certain patented audions for which that company was licensee with the right to sublicense. To which the company replied in writing that it would not do anything to interfere with the immediate manufacture, providing it were understood and agreed that the company waived none of its claims under any patent or patent rights owned by it on account of said manufacture, and that all claimed patent rights and all patent questions be reserved and later investigated, adjusted and settled by the United States. Whereupon, the United States proceeded to manufacture and use the articles. The company assisted by furnishing information and advice.

In its suit against the United States for infringement the owner of the patent claimed that the necessary effect of the writings given by the licensee telephone company to the government was to say to the government, "If you make my patented articles 'you will be infringing my rights. I shall not stop you but I notify you that I shall hold you for such infringement,'" and, therefore, that the subsequent acts of the United States and its manufacturers were torts remediable in an infringement suit in the usual form. The Supreme Court said:

"We think a different construction should be given the allegations. The agreement by the Telephone Company that it would not do anything to interfere with the immediate making of the audions for the United States, interpreted in the light of its subsequent action in assisting the United States to a prompt making of the audions for its use, in furnishing the needed information and drawings and blueprints for such manufacture, and in giving to the experts of the United States and its manufacturers the opportunity to witness and study the manufacture of audions by the Telephone Company, to the end that the audions might be more promptly manufactured and delivered to the United States for use in the war, made such conduct clearly a consent to their manufacture and use, and a license, and this without any regard to the effect of the subsequent release by the Telephone & Telegraph Company of compensation for such manufacture and use. No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort. Whether this constitutes a gratuitous license, or one for a reasonable compensation, must, of course, depend upon the circumstances; but the relation between the parties thereafter in respect of any suit brought must be held to be contractual, and not an unlawful invasion of the rights of the owner. Concede that, if the owner had said, 'If you go on and infringe my patent, I shall not attempt to enjoin you, but I shall subsequently sue you for infringement,' the tort would not be waived; that is not this case. Here the circumstances show clearly that what the company was doing was not only fully consenting to the making and using by the United States of the patent, but was aiding such making and using, and in doing so was licensing it, only postponing to subsequent settlement what reasonable com-

504

pensation, if any, it might claim for its license. * * *

"In this case the language used certainly indicated the purpose of the Telephone Company not to seek an injunction against infringement, and not to sue for damages therefor, but only to sue or seek for an amicable settlement by payment of just compensation. Such action by the Telephone Company was a license, and constituted a complete defense against a suit for infringement by the De Forest Company."

█ It will be noted that the Supreme Court found the license effective to defeat the infringement suit, notwithstanding there were no express words defining the duration of the license; there were no figures set down as to amounts of royalty; nothing as to inspections; nothing as to territorial limitations; nothing as to the time for payment of royalties. The gist of the holding being that any conduct on the part of the owner of a patent exhibited to another from which that other may properly infer that the owner consents to his using the patent upon which the other acts, constitutes a license and a defense to an action for a tort, that is, a patent infringement suit.

We think the principles applied to the facts in the present case clearly compel the dismissal of the bill decreed by the trial court.

█ In this case the matter was taken up whether the city of St. Louis would specify patent processed paving exclusively for city work. Plaintiffs held the patents and defendant's costly plant could not meet such specification. The respective interests of the patent owners, the city, the contractors, and this individual contractor were clearly defined. The plaintiffs wanted their process specified. The city wanted the best paving, but under free competition. Each and all of the contractors wanted the work. That situation being perfectly understood by all, the plaintiffs, before the city heard and decided upon the exclusive specification, gave the defendant the written proposal to furnish the required patented machine on specified terms. The defendant, so assured that the machine would be furnished as promised in writing, appeared before the city board with the other contractors and in plaintiffs' presence and hearing assured the board of its ability to compete under the exclusive specification. Plaintiff had not, in its first writing, fixed the time within which it would furnish the machine which it had proposed to furnish. The exclusive specification by the city was imminent. On April 20th, after the hearing and

before the adoption of the exclusive specification, the plaintiff wrote its acceptance of the understanding that it would enter defendant's order for the mixer on the adoption by the city of the exclusive specification and could deliver it on the specified terms within five weeks from that date. Thereafter, the exclusive specifications were made by the city. The defendant undertook contracts and gave bonds thereunder. Plaintiffs' conduct was an assurance to the defendant that defendant could use the patented process in its St. Louis paving work on paying therefor as stipulated in the writing.

When the plaintiff proposed in writing to furnish a mixer on certain terms of royalty and deposit and the defendant, in writing, agreed to the proposal and fixed the time of delivery, and the plaintiff indicated its acceptance, there was a completed contract and an effective grant of license. When the plaintiffs stood by and let the defendant declare its ability to compete under the exclusive specification and let the defendant bid and take contracts under such specification, under all the circumstances, such conduct justified the defendant in believing that the plaintiffs consented to the use of their patents.

It appears that after defendant had ordered the patented machine from the plaintiff and had protested about delayed delivery, the plaintiff assured the defendant in writing that it was "staying right on the manufacturer" to expedite completion of the machine. This could only have meant that the plaintiff was then directly aiding and assisting the defendant in the direction of the defendant's making use of the patented machine. It was full recognition that the defendant had a right to have the machine and use it. In this respect there is close analogy to the aid and assistance which the telephone company gave to the government in the case of De Forest Co. v. United States, supra. The language of the Supreme Court is directly applicable: "Here the circumstances show clearly that what the company was doing was not only fully consenting to the making and using by the United States of the patent, but was aiding such making and using, and in doing so was licensing it."

Much of the argument in the brief of appellant concerns the provision appearing at the end of the letter of April 9, 1931, "The above terms will be set forth in a uniform contract if you desire to use this process."

█ The trial court found upon consideration of all of the circumstances that "the sentence was not carried into and did not become part

of the later contract and that the language merely manifests an intention to prepare and adopt a written memorial of the terms agreed upon." We think the conclusion is sound and fully borne out. Defendant's representative testified in effect that what he wanted before he would agree to the exclusive specification, and before he would take contracts from the city thereunder and give bonds, was a contract from the plaintiff, without any strings to it, specifying just what the machine and process was going to cost him and just when the plaintiffs were going to deliver. He made this entirely plain to the plaintiffs and the conditions were fairly covered in writing. It is true there was an expectation that a more formal memorial would be drawn up, but, on the other hand, the understanding was complete that within five weeks from the adoption of the exclusive specification by the city, the patented machine would be delivered to the defendant and the defendant would be under the obligation of paying certain definite specified amounts to the plaintiff on account of receiving the machine and using it. It is not proven that there was any understanding that any additional or different payments or obligations would be undertaken by the defendant or required by the plaintiffs. The law is well settled that where an anticipated formal writing is to merely memorialize what has been fully agreed upon there is a contract, notwithstanding the formal memorial is not drawn up or executed. American Bentonite Corp. v. Clark Equipment Co. (D. C.) 43 F.(2d) 392. The cases cited for appellants to sustain the contention that no contract was completed under the facts of this case absent the uniform contract, are not inconsistent with this opinion. Such cases are Mississippi & D. Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 41 Am. St. Rep. 545; Barber-Colman Co. v. Magnano Corp. (C. C. A.) 299 F. 401; General Motors Corp. v. Abell (C. C. A.) 292 F. 922; Ben-Wat Corp. v. David Lupton's Sons Co. (C. C. A.) 13 F.(2d) 390; Horvath v. McCord Radiator & Mfg. Co. (C. C. A.) 35 F.(2d) 640; American Bentonite Corp. et al. v. Clark Equipment Co. (D. C.) 43 F.(2d) 392; Elkhorn-Hazard Coal Co. v. Kentucky River Coal Corp. (C. C. A.) 20 F.(2d) 67; Northwestern Lumber Co. v. Grays Harbor & P. S. Ry. Co. (C. C. A.) 221 F. 807; Hackley v. Oakford (C. C. A.) 98 F. 781; McCormick v. Oklahoma City et al (C. C. A.) 203 F. 921; Boatright v. Steinite Radio Corp. (C. C. A.) 46 F.(2d) 385; Eads v. City of Carondelet, 42 Mo. 113; Bourne v. A. F. Shapleigh, 9 Mo. App. 64; Brown et al. v. New York Central R. Co., 44 N. Y. 79; Arnold v. Rothschild's Sons Co., 37 App. Div. 564, 56 N. Y. S. 161; Sherry v. Proal, 131 App. Div. 774, 116 N. Y. S. 234; Sourwine v. Truscott, 17 Hun (N. Y.) 432; Sparks v. Pittsburgh Co., 159 Pa. 295, 28 A. 152; Grant v. Jaeger, 224 Ill. App. 538; Stuart & Wood, Inc., v. Palisades, etc., Corp., 109 N. J. Eq. 401, 157 A. 659; Case Threshing Machine Co. v. Buick Motor Co. (C. C. A.) 39 F.(2d) 305.

■ It is argued for appellant that even if there was a grant of license, the defendant still did not have the right to make the machine itself or use the method. The conclusion of the trial court that the default of the plaintiff corporation in furnishing the defendant a mixer as agreed by the terms of the contract gave the defendant the right to procure it elsewhere and use the method, is fully sustained by the authorities. Dunkley Co. v. California Packing Corporation (C. C. A.) 277 F. 996; 48 Corpus Juris 268, § 419.

■ A point is stressed for the appellant that the contract for the delivery to the defendant of a mixing machine and specifying what is to be paid on account of defendant's use thereof does not fix a time limit for the license contract. It has been held that a license not expressly limited in duration continues until the patent expires, and it may be that such is the effect of the transactions in this case, but we need not decide. Walker on Patents (6th Ed.) § 357; 20 Ruling Case Law, 1187; 48 Corpus Juris, 270; Edison Elec. Light Co. v. Peninsular Light, Power & Heat Co. (C. C.) 95 F. 669.

It is clearly shown in this case that the understandings arrived at related directly to the exclusive specification of the patented process for paving in the city of St. Louis, and it does not appear that the defendant used it for anything except to comply with such specifications. The evidence is that the board of public service has the power at any time to make entirely different paving specifications. As it clearly appears that all the transactions were had in direct relation to the exclusive specifications determined on by the board, there is necessary implication that, at least during the continuance of that condition within the life of the patents, the plaintiffs cannot maintain an infringement suit against the defendant. As in the case of De Forest v. United States, supra, there appeared to be no time limit to the license, but the whole understanding related to the war in which the United States was engaged.

506

Undoubtedly it was the duration of the war that was in the minds of the parties. Naturally, the scope of an implied license depends upon the circumstances which created it, and it rests ultimately upon the intention of the parties. Neon Signal Devices, Inc., v. Alpha-Claude Neon Corporation (D. C.) 54 F.(2d) 793. So, in this case, the continuance of the defendant in the paving contracting business, seeking, getting, and filling contracts for the city under the exclusive specifications, was in the minds of all.

Under all the facts in this case it is unconscionable and contrary to equity for the plaintiffs to assert a refusal of its consent to the defendant to use the patented process to the extent that the defendant has used it and is now using it.

The defendant has offered and made tender of payment for the compensation the parties agreed upon. No more could be required of it.

Our comparison of the findings with the pleadings and the testimony has persuaded us that the findings are within the pleadings, there is substantial evidence to sustain them, and that the conclusions of law are correctly drawn therefrom.

The decree is affirmed.