**HAMILTON FOUNDRY & MACH. CO v. INTERNATIONAL MOLDERS & FOUNDRY WORKERS UNION OF NORTH AMERICA (A. F. OF L.) et al.**

Civ. No. 2075.

United States District Court
S. D. Ohio, W. D.

Jan. 8, 1951.

Taft, Stettinius & Hollister, Cincinnati, Ohio, for plaintiff.

Long & Bloom and Robert A. Wilson, all of Cincinnati, Ohio, for defendant.

DRUFFEL, District Judge.

Both defendants have moved for a new trial and for final judgment notwithstanding the verdict of the jury awarding plaintiff $37,500.00 as damages for a breach of a claimed partial written and partial oral collective bargaining agreement.

The action was commenced by plaintiff for breach of a no-strike clause following the commencement of a strike called by Local 68. Defendants deny the existence of a contract at the time of calling the strike and the defendant, the International Union, further contends that both plaintiff and Local 68 knew that it was not to be a party to the contract then under discussion.

From the testimony it appears that prior to the commencement of this action plaintiff and Local 68 had a bargaining history for more than ten years and written agreements were entered into annually. Section XI-a of the last contract provided: "this agreement shall continue in effect until February 28, 1949, and for each succeeding year thereafter, unless either party to this agreement gives sixty days written notice previous to the expiration date."

Pursuant to written notice negotiations for a 1949 agreement were begun and a total of five bargaining meetings had between plaintiff and a committee representing Local 68, the final meeting being held March 24, 1949. Up to this time a portion of the foundry had been operating on day work rates and a portion on a piece work basis and in the new contract the company proposed that the entire plant be placed on a piece work basis with a few minor exceptions.

This was the principal bone of contention in Local 68. As an inducement the

company offered an increase of five cents an hour plus some other minor concessions. At the conclusion of the meeting March 24th, plaintiff delivered to the committee representing Local 68 a written proposal outlining the various rates of pay and terms and conditions of employment. The proposal was signed:

"The Hamilton Foundry & Machine Co.

> By (Signed) Peter E. Rentschler
> Peter E. Rentschler, President"

and space provided for other signatures as follows:

"Local No. 68, International Molders & Foundry Workers Union of North America

> By ————
> Robert Harding, Jr.
> ————
> Carl Fatika
> ————
> Pliney Dudley
> ————
> Ray Bannon
> ————
> E. R. Mitchell
> ————
> M. D. McCune, District Representative, I.M. & F.W.U. of N. A."

The written proposal followed the pattern of the previous annual agreements existing between plaintiff and Local 68. Among other conditions therein, Section I (A–6) reads:

"To Put Into Effect the Day Work Rates

\* \* \*

"It is understood that upon the signing of this agreement the existing individual day work rates of each employee shall be increased five cents per hour effective March 28, 1949."

The committee agreed to present this written proposal to a meeting of employees of plaintiff who were members of Local 68 for discussion and a recommendation to Local 68 as a whole, at its regular meeting the following Monday night, March 28, 1949. Local 68 was made up of employees of approximately seven foundries operating in and about Hamilton including employees of plaintiff company.

At the conclusion of the final bargaining meeting M. D. McCune, one of the committeemen agreed to telephone Mr. McDaniel, plaintiff's vice president, the following day as to what recommendations, if any, were to be made by plaintiff's employees to the regular meeting of Local 68 the following Monday.

The importance of the telephone report was to advise plaintiff whether the men would report on Monday for work so as to give plaintiff sufficient time to affix piece-work price tags to each of the various operations, so that the workmen would know exactly how much they were being paid for each job.

From this point on the testimony is in conflict. To support plaintiff's claim that an oral contract was made, Donald McDaniel, Vice President of plaintiff, testified that McCune phoned him Saturday, March 26, 1949, that at the employees' meeting Friday night they had agreed to the proposal that plaintiff had made them on Thursday; that he asked McCune whether he had much trouble doing it, and McCune said "Well, it wasn't easy."

From the foregoing telephone conversation, assuming McDaniel's version was true, plaintiff contends that the jury could and did find that the defendants became bound to an agreement with the plaintiff on Saturday morning, March 26th without any further action on the part of Local 68 or the International.

For the defendants, Chester Sample, President of the International, testified that the International had no authority with reference to contracts made by local unions, except that they cannot call strikes unless the International has previously sanctioned them; that he entered negotiations for the first time March 24th at the invitation of the shop committee of the Hamilton Foundry after they advised they were unable to reach an agreement with plaintiff; that at the conclusion of the meeting he agreed to attend the Friday night meeting of the employees of plaintiff company; that he together with the other members of the committee did go to the meeting and tried to point out to the employees the position taken by the

firm in regard to the time study or piece-work plan; that that was the main question, and the principal obstacle to the men going along; that plaintiff's employees had previously opposed this system, and that he had endeavored to get them to decide again whether they would work under it or not; that they very strenuously objected to it and were not going to vote on it again; that after this they began to talk about putting into effect a previously granted sanction permitting Local 68 to call a strike. Chester Sample further testified "I advised them not to be in any hurry about striking, and I told them that I thought they ought to stay at work and give the committee a further opportunity of meeting the company and trying to work out an agreement * * * and they then decided by vote to continue to work for a week * * * to give the committee an opportunity to work out an agreement.

"I then attended the meeting of Local 68, Monday, March 28th and there the committee and officers made a report to the local union as to the negotiations; what action the membership had taken on Friday night, and the local union approved of that action * * * of staying at work for a week and seeing if something would develop that we would be able to work out an agreement with the company." (Record, pages 179, 182.)

Merlin D. McCune, District Representative of the Miami Valley Conference Board comprising sixteen locals and a member of the negotiation committee, testified among other things, that: following the meeting of March 24th he together with the other members of the Shop Committee went to the meeting of plaintiff's employees and presented plaintiff's written proposal to the group; that he and the other members of the committee recommended its acceptance and upon discussion of a motion to approve: "Everything blew up. All the members got up and tried to talk at one time and positively refused to vote on the question. And later the motion was withdrawn to vote to accept or reject the company's proposal;" that the following day, Saturday, March 26th,

he phoned plaintiff's Vice President McDaniel to report as per arrangement of the 24th. "McDaniel asked: 'How did you make out last night?' I said 'Not so good.' He said, 'What do you mean?' I said, 'Well, they voted last night not to put the strike sanction in effect.' He said, 'Well, what does that mean?' I said, 'I suppose it means if you put the proposition in effect they're going to work under it. If you're fair about it and you're going to do as you stated throughout our negotiations that there probably won't be any trouble and we'll be able to sign the agreement on Wednesday.'" (Record, page 216.)

And by way of further explanation Mr. McCune testified:

"A. We felt sure that if they went to work on Monday that the plan would be put into effect, and under the new system—

"Q. Now, by plan, you mean the time-study plan? A. The time-study plan would be put into effect.

"Q. All right. A. We felt that if they worked under it a while and if there were no difficulties and it was fair and they didn't intend to cut the wages, that the men would be agreeable and we would be able to sign the agreement on Wednesday. But when they tried it on Monday, that's when things broke loose.

"Q. Now then, what broke loose? What happened? A. Well, they started to work on Monday. After receiving the cards and the time study they started to work. They seen where the number of molds that they had to make in a certain day * * *. The jobs were cut as high as 30 per cent—or the jobs were added that much. * * *." (Record, pages 217, 219.)

Robert Harding also testified for defendants among other things as follows: that he was a member of the bargaining committee of Local 68; that when their committee was unable to reach an agreement with plaintiff the Local invited Mr. Sample and McCune to assist; that he presided at the Friday night meeting of the employees of plaintiff; that a motion was made to accept the company's proposal and during the discussion on it "there was such a turmoil in the meeting * * * they

refused to vote on it and the man who made the motion withdrew it;" that at the regular meeting of Local 68 the following Monday night the Committee reported the result of the Friday meeting turning down the company's proposal and also to withhold the strike sanction, "and the Local went along and approved the committee's report;" that a special meeting of Local 68 was called the following Saturday morning April 2nd at which "the men wanted to take another vote and rescind their former action on not striking the week before, and they voted again to put the strike sanction into effect, go in effect on April the 4th." (Record, page 251.)

To maintain its modified position as indicated by its amended complaint that the contract sued upon was partly in writing (its signed proposal) and partly oral (McCune's telephone call to McDaniel) plaintiff offered three rebuttal witnesses, former members of Local 68, and presently employed by plaintiff.

Wilburn Bicknell testified among other things: that he attended the employees' meeting Friday night, March 25th; that "they read the contract that Mr. Rentschler had drawn up to present to the men, whether for the time study to go in. Some of the men didn't like it, so it was brought to a vote, whether we should accept the contract or reject it. And we took a secret ballot and voted to accept the contract.

"Q. Did Mr. McCune say anything during the course of the evening that you heard, that you recall? A. Well, there was a lot of talk and confusion. I couldn't say for sure.

"Q. Was anything said by any member of the committee or by Mr. McCune after the vote was taken that you can recall? A. Mr. McCune said that he would call Mr. Rentschler Saturday morning and tell him that they would sign the contract." (Record, pages 283, 284, 285.)

And on cross-examination Mr. Bicknell testified:

"Q. At that meeting, Mr. Bicknell, was there any discussion or any action taken with reference to whether the men would

strike or not? A. Well, that was—If we wouldn't accept the contract; why, it was either to vote on the contract or go on a strike.

"Q. And at that meeting they voted to strike, did they? A. No, sir.

"Q. They voted not to strike, didn't they? A. Yes, sir.

"Q. And Mr. Sample advised the men to go back on Monday, not strike, and try out this time-study plan to see whether it would work out; isn't that right? A. He asked them if it wouldn't be a good idea if they'd go along with this contract; and, if there was any dissatisfaction with it, they could take it up under a grievance and it would be ironed out. * * *

"Q. Now, this meeting on the 25th that you attended, that was a meeting of the members of Local 68 who were working for Mr. Rentschler's foundry, is that right? A. Yes, sir.

"Q. That wasn't an official meeting of the entire Local 68, was it? A. No, sir." (Record, pages 285, 286.)

Willie Sherman testified among other things: he attended the Friday night meeting:

"Q. And will you tell us, according to your best recollection, what occurred at the meeting after you got there on that evening? Just what happened, to the best of your recollection? A. Well, we taken vote to accept the contract.

"Q. Well, was that the very first thing that was done or were there some discussions or anything in the meeting? A. Well, this fellow brought the proposal back to us and said, 'Here it is.' He said, 'You better accept it.' He brought the proposal back to us, said that we could either accept it or turn it down, take a vote. So we taken a vote, all of us, that Friday.

"Q. Now, you've talked about a meeting that was held about a week later, on a Saturday, you said. Were you at that meeting? A. Yeah. It was Saturday morning. Well, when they come up that Saturday, that's when what I was talking about, the big fuss, started. We had done voted to accept the contract. Then they taken another vote that time, about, I

guess, seven or half of us for it and the rest of them were again it. I mean the majority of them went out on strike. It left about seven of us couldn't win with the majority of them." (Record, pages 294, 297, 298.)

And on cross-examination, Sherman testified:

"Q. And now, was there anything said at that 25th meeting, Willie, about not going on a strike? That wasn't discussed, was it? A. What did you say?

"Q. At the 25th meeting there wasn't a thing said about not going out on strike? A. We voted to accept the contract.

"The Court: No. Answer the question now. Listen to the question.

"Q. I am asking you whether anything was said while you were at the meeting about not striking on the following Monday? A. Yeah, some of them was talking about it.

"Q. Now, Mr. Sample told the boys that they oughtn't to strike on Monday, didn't he? Do you remember him saying that? A. He told them that, not to strike at all.

"Q. Don't strike at all. Go on back and go to work Monday, and we'll go over to Mr. Rentschler and see if we can't work this thing out. Didn't he say that? A. Yeah.

"Q. You remember that, don't you, Willie? A. Yeah." (Record, page 303.)

John Johnson also testified on rebuttal, but his testimony was so meaningless it will not be discussed.

The foregoing in the opinion of the Court represents the high spots of the pertinent and controlling testimony, and viewed from the standpoint most favorable to the plaintiff does not support the verdict.

Giving full credit to McDaniel's testimony of his conversation with McCune and to the rebuttal witnesses' testimony that the Friday night meeting by a secret ballot accepted plaintiff's proposal, it at best represented the action of plaintiff's employees who were members of Local 68, and did not represent the official action of Local 68, a necessary party to the contract.

However, impartial analysis indicates that defendants' testimony that the only ballot taken at the Friday night meeting was "to not invoke the strike sanction" is the correct version of what actually took place. That this is so, is amply confirmed by rebuttal witnesses' testimony as to the discord and confusion prevailing at the meeting and also as to Sample's urgent appeals to the meeting not to go on a strike.

■ In addition to the foregoing, it is well settled law that an unsigned contract cannot be enforced by either of the parties, however completely it may express their mutual agreement, if it was also agreed that the contract should not be binding until signed by both of them. Hardwood Package Co. v. Courtney Co., Court of Appeals, 4 Cir., 253 F. 929.

To the same effect is American Bentonite Corporation v. Clark Equipment Co., 43 F.2d 392, where District Judge Raymond held that in the absence of signatures the contract was not consummated, and which decision was affirmed by the Court of Appeals, 6th Cir., 43 F.2d 1023.

In his opinion Judge Raymond quoted with approval from Mississippi & D. Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, the following: "If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument, and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally

signed * * * If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract." [43 F.2d 393.]

Here there can be no question that both parties intended that neither would be bound unless and until there was a written and signed agreement, as witness the legal requirement of Section 158(d) of Title 29 U.S.C.A., the Labor Management Relations Act, 1947: "* * * employer and the representative of the employees * * ، * confer * * * with respect to wages * * * terms * * * or the negotiation of an agreement * * * and the execution of a written contract incorporating any agreement reached if requested by either party * * *."

Also and as bearing on the intentions of the parties: after a written request by defendant, the plaintiff and a committee representing the employees held five bargaining meetings, the minutes of which were fully and completely reported, wherein the parties discussed the terms and conditions of employment and particularly the new piece work or time-study plan. At the meeting of March 3, 1949, Mr. Rentschler is quoted as saying: "And I'd say, as far as I'm concerned, the Industrial Engineering goes in or we don't have an agreement. * * * that is a very positive position, and we will stand on that." (Pltf.'s Ex. 6 —Minutes of Bargaining Meeting March 3, 1949.)

At the conclusion of the final meeting March 24, 1949, the shop committee was given a written proposal, signed by plaintiff's president and providing space for signatures of the officials of Local 68, and containing a clause (Section I, A-6) providing for it to be effective upon the signing of the agreement, all of which follows an accepted pattern of procedure between the parties for the past ten years.

 Under the circumstances this court has no alternative but to find as a matter of fact from all the evidence that both parties fully intended that neither would be bound unless and until they signed the agreement, and since Local 68 did not

sign there was no binding agreement existing, and also to hold that plaintiff has failed to sustain the burden of proof of its complaint and the amendments thereto and by reason thereof the verdict of the jury and the judgment entered thereon should be and hereby is set aside and held for naught, and also that upon further consideration of the entire record, this court now finds that defendants' motions for final judgment notwithstanding the verdict are well taken and the same are granted, and in the event of a reversal of the final judgment a new trial is granted. An entry may be prepared accordingly with exceptions.