**T. H. SYMINGTON & SON, Inc., v. SYMINGTON CO.**

**No. 2208.**

District Court, D. Maryland.

Feb. 8, 1935.

James Piper and Piper, Carey & Hall, all of Baltimore, Md., Frank Parker Davis, John W. Darley, and Rector, Hibben, Davis & McCauley, all of Chicago, Ill., for plaintiff.

Harry N. Baetjer and Venable, Baetjer & Howard, all of Baltimore, Md., Ernest F. Mechlin and Gilbert P. Ritter, both of Washington, D. C., for defendant.

CHESNUT, District Judge.

This case presents the usual type of patent infringement suit in equity. Plaintiff's patent is for a "spring mechanism" applicable to railroad freight cars. It was issued January 12, 1932, on application of Cyrus Hankins, filed January 24, 1925. Its number is 1,840,506.

The defenses are the usual ones of (1) invalidity of the plaintiff's patent and (2) non-infringement. A counter-claim which set up an alleged equitable title in the defendant to the plaintiff's patent has been withdrawn.

The plaintiff's patented invention has never been reduced to commercial practice and no model illustrating the specific form intended to be used thereunder was introduced in evidence and apparently none has ever been made. The defendant's car spring is made and sold by licensees under defendant's patent No. 1,727,886, dated September 10, 1929, on patent application by Kadel and Barrows filed December 3, 1927; application for reissue filed October 17, 1931, and patent re-issued November 24, 1931, Re. 18266. The defendant's spring assembly takes the form of a combination of coil and elliptic springs placed in what is called the "window" of the trucks of freight cars. This spring assembly is commonly referred to as the "coil-elliptic." It is plaintiff's contention that the principle of its patent and the claims therefor are broad enough to cover

the defendant's device; but the defendant contends that the plaintiff's patent if valid at all must be limited by interpretation to the use of disk or plate springs, alone or in combination with coil springs; and so limited, the defendant's device does not infringe.

Both plaintiff and defendant are Maryland corporations, the latter having its plant, however, in Rochester, N. Y.; and both are engaged or interested in the manufacture and sale of railway car appliances. The similarity of names and the relationship of the parties requires some little explanation to avoid confusion. The defendant, the Symington Company, was originally incorporated under the laws of Delaware under the name of the T. H. Symington Company. The late Thomas H. Symington of Baltimore was the organizer and the principal owner of the corporation until it was financially reorganized and re-incorporated in Maryland under the name of the Symington Company in 1924; and thereafter Thomas H. Symington retired from his connection with the defendant and became interested in a then existing corporation known as the Ultimate Equipment Company, the corporate name of which was shortly thereafter changed to that of T. H. Symington & Son, Inc., the plaintiff in this case. Hankins, the patentee of the plaintiff's patent, and also Byers W. Kadel, one of the defendant's patentees, were employed by the original defendant company up to about the time of the re-organization of the defendant company, after which Hankins continued his association with Thomas H. Symington in the service of the plaintiff corporation, but Kadel continued to do work for both corporations for two or three years thereafter. Under date of June 20, 1924, Symington, Hankins and Kadel made a written memorandum looking to the development of patented devices for the plaintiff corporation, which, however, was cancelled by Symington (at least so far as Kadel was concerned) on February 10, 1927. Although not named in the plaintiff's patent, Kadel was generally familiar with and took some part in the development of Hankins' patent application. The close relationship of the parties and the fact that the two patent applications were for a time co-pending in the Patent Office, might be thought to give color to the plaintiff's claim of infringement, but, as will later appear, this possible inference is not sustained by the testimony in the case. It will be noted that the defendant's patent application was not filed until nearly a year after the termination of Kadel's association with the plaintiff. The defendant's patent was originally issued September 10, 1929, and its car spring assembly has been on the market and in apparently wide and successful commercial use for some years, while the plaintiff's patent was not issued until January 12, 1932, and has never been reduced to commercial practice. The defendant began to sell its device in the fall of 1932 and up to the present time there have been sold through its licensees 22,122 car sets, each set consisting of four spring assemblies. The sale price is approximately $60 per car set.

Defendant's contention is that the plaintiff's patent is invalid for two reasons. One rests on procedural grounds, that the patent as issued is substantially different from the patent originally applied for, without a supplementary oath of invention by the patentee. The other ground is substantial, in that it is said the prior art negatives the invention as claimed. In the alternative defendant contends that if the plaintiff's patent is to be treated as valid at all, it must be so limited and restricted in its operative effect as to include only the use of disk or plate springs alone or in combination with coil springs and thus cannot cover the defendant's combination of coil-elliptic springs. An understanding of these contentions necessitates some description of the construction of the typical railroad freight car with special reference to the trucks in which the spring assembly is located.

The ordinary freight car is, of course, a familiar object. It was described, to the extent necessary for the particular case (one of railway cost accounting), by Judge Soper in Chesapeake & Ohio R. R. Co. v. United States (D. C.) 5 F. Supp. 7, 10. A somewhat more detailed description is necessary here. The main constituent parts of the car are the body and trucks. Each car has two trucks, one under each end of the car; and each truck has four wheels, two for each rail. The wheels for each rail are attached to what are called side frames which are placed longitudinal to the length of the car, and these side frames, one on each side of the car, are connected by a transverse beam called a bolster on which the weight of the car body and its lading rests. In the middle of the side frame and between the two wheels there is an open space which is called the "window." The bolster is securely fixed into the top of this opening, and attached to the bottom of the window opening is an-

other transverse beam which connects the side frames on opposite sides and is placed underneath and parallel to the bolster and is called the spring plank. For some years past the side frames have been largely standardized and the type now in most general use is known as the "cast steel" frame which has superseded the "arch bar" construction, both being of the general type known as the "diamond" frame. The size of the opening is approximately 16 inches wide by 20 inches high with a depth sufficient to accommodate the spring assembly, which thus has for its basis of support the spring plank, and in turn supports the bolster which carries the load of the car body and its contents.

In the operation of the car, the springs are designed with sufficient capacity to sustain a compression of 1 inch when the car carries its maximum load and is at rest, and to have a further compression capacity of 11/16 of an inch while the car is in motion, or, as sometimes expressed, while it is under the impulse of inertial loads. Generally this additional 11/16 of an inch of compressibility of the springs is sufficient to withstand the travel shocks sustained by the car from the speed of the train and the inequalities of the trackage. But if due to weight of the load, excessive speed and unusually uneven trackage the vibratory motion of the car becomes greater than normal, the springs will close, and thus become dead, and result in damage to the lading of the car due to excessive shocks. The purposes of the improved spring mechanism covered by the patents we are here dealing with, are to avoid this result. Prior to these patents the most usual type of spring assembly consisted of a number of the familiar type of coil springs (sometimes called helical) located in the window opening of the side frames, in size, number and resistance designed to meet the conditions anticipated as a result of the varying maximum loads of the railroad cars. The most usual arrangement was an assembly of four separate coils placed side by side in the window opening and thus in parallel relation to each other with reference to the stresses of the load. But the history of the art shows very clearly that coil springs have not heretofore been solely or universally used for railroad cars. Other well known types of springs which have been used are the familiar elliptic (in common use on automobiles), disk springs (shaped like thin round plates and slightly dished at the centre not heretofore used for railroad cars), and the volute springs (having overlapping spirals, somewhat like a curled shaving). Elliptic springs are so much more costly than coil springs that the former have heretofore seldom been used for freight cars but where ease of riding is essential as in Pullman passenger cars and in tenders for locomotives and in cabooses for freight trains, elliptic springs are in general use. Heretofore at times but not commonly, the spring assembly for railway cars has consisted of a combination of two of these types of springs, and generally the spring assembly has been placed in the window opening of the side frames although sometimes located partly elsewhere.

Another objection to the efficiency of coil springs in operation is that they tend to have a uniform period of vibration and thus with excessive travel shocks of unusual severity the amplitude of vibration is gradually cumulatively widened until the coils are completely closed and thus become dead and lose their resiliency. To overcome this defect a combination of different types of springs with different periods of vibration has been heretofore at times resorted to in order to check the tendency of excessive amplitude of vibration. The practical problem, however, has been to secure a combination which will be both effective and economical in cost and susceptible of a compact arrangement or assembly which will permit location in the comparatively restricted size of the window opening of the side frames of the trucks of freight cars. It is said that the defendant's coil-elliptic device has measurably at least successfully met these difficulties; and it is urged for the plaintiff's device which has not been yet put to actual test, that it is susceptible of even more satisfactorily serving the same and other difficulties in operation. Thus it is said in the opening paragraphs of the plaintiff's patent that "the primary object of the invention, generally stated, is to provide a spring unit or assembly adapted for location within the window or bolster opening of a truck side frame in the usual manner and formed or arranged as a combination of disk or frictional resistance and coil or live springs which will coact to give proper resilience."

This preliminary understanding of the subject matter furnishes the approach to the particular problem as to the validity or invalidity of the plaintiff's patent, or, in the alternative, whether it is to be given a broad or narrow interpretation, and thus to include or exclude the defendant's spring assembly as an infringement. Plaintiff's pat-

702

ent as issued contains 18 claims of which, however, only the following numbered claims are relied on for purposes of this case, to wit, Nos. 2, 4, 6, 7, 9, 10 and 16. Of these, claim No. 16 is referred to as probably the most comprehensive statement of the essential elements of the plaintiff's alleged invention. It reads as follows:

"A spring nest for railway cars comprising in combination, spring means composed of a plurality of superposed, curved plate members, and helical spring means operating in unison therewith, said means being located adjacent each other for the direct subjection of each to the bolster load and the disposition of the vertical axes of all of said springs radially from the vertical center line of the window opening of an associated side frame being limited by the marginal outline of the spring seat portion of said frame, the application of the load to said spring means causing a rubbing action between said plate members."

Translating this somewhat general and formal language into simpler and more concrete phraseology, what the plaintiff claims, as contended for by its counsel, is (1) a combination of different types of springs such as (a) coil (or helical) springs, with (b) any form of frictional resistance springs, such as disk or plate springs or elliptic springs, (2) ranged side by side or in parallel relation, and (3) capable of assembly wholly in the window opening of the side frame of the trucks of freight cars. And, says the plaintiff, the claim thus covers the defendant's device, which defendant admits is true, if the plaintiff's patent is broad enough to cover a combination of coil and elliptic springs (and is not construed narrowly to a combination of coil and disk springs); because it is admitted by the defendant that its combination is designed for the parallel relation of the two types of springs and is placed within the window opening. The crux of the matter is thus seen to be whether the plaintiff's patent properly interpreted can cover coil springs and any type of frictional resistance springs (such as elliptic springs) or must be limited to disk springs as *the* type of frictional resistance springs covered by the patent. The words of the claim in describing the frictional resistance springs (as contrasted with helical or coil springs) are "spring means composed of a plurality of superposed, curved plate members." The plaintiff affirms and the defendant denies, that this wording embraces elliptic springs. The

term "plates" is more accurately descriptive of disk, than elliptic springs; the word "leaves" being more commonly applied to the several layers of the latter. But other claims in the plaintiff's patent are worded more generally and with more plausibility to cover elliptic springs if they are to be regarded as frictional resistance springs within the meaning of the plaintiff's patent. Thus, claim No. 2 reads:

"A spring suspension for railway cars, comprising top and bottom follower plates, a plurality of freely movable helical springs interposed between said plates and distributed about the area thereof and one or more frictional resistance springs, all of said springs acting in unison."

It will be observed that this latter claim is not worded in such a way as to include the elements of parallel relation of the springs and location within the window opening. In claim 6 the housing of the spring assembly in the window opening is postulated while the parallel feature is stated somewhat vaguely under the expression "operating in unison," while the type of spring in the combination, other than the coil springs, is again rather loosely described as "spring means having surfaces adapted for a rubbing action upon each other." It will be noted that in these several claims the type of spring to be associated with the coil springs is variously described as (a) curved plate members; (b) frictional resistance springs and (c) spring means having surfaces adapted for a rubbing action upon each other. And at the risk of unnecessary repetition, but for clarity, defendant's contention (for reasons to be more particularly stated hereafter) is that, although variously described, the type of spring referred to in the patent must be taken to be only the disk spring which is quite unlike the elliptic spring in form and appearance and is said by the defendant to be materially different in its functional activity. The other elements of the plaintiff's claim, to wit, the parallel arrangement and the location of the spring assembly in the window opening, clearly, in view of the prior art, are of no novelty. Indeed there is very substantial doubt as to whether, in view of the prior art, there can be said to be novelty of invention in the plaintiff's claim for a combination of coil and disk springs. And if the plaintiff's broader claim is to be sustained so as to include a combination of coil or helical or live springs with any type of frictional resistance springs, the claim is clearly invalid to that extent in view of the

prior art. We are obviously dealing with a crowded field, as is to be expected in an art so old as that of railway cars.

The defendant has offered in evidence twenty patents showing the prior art. It will be sufficient to refer to a few only. Thus, Gardiner, No. 38,105 (April 7, 1863) discloses a car spring for railroad cars consisting of a combination of coil or spiral springs with semi-elliptic springs which he designated as the "combined spiral-elliptic wool packed car spring." Baines (No. 578,-305—1897) also shows a combination of coil and elliptic springs for car trucks. Shea (No. 757,781—1904) shows coil springs arranged with a type of frictional resistance plates, for controlling or retarding the recoil of coil springs which are described as follows: "So that they can be used in place of the more expensive and cumbersome elliptic or leaf springs; and it consists, essentially, in providing the ends of the cap-plate flanges enclosing the coils with reversely-bent inclined ends forming resilient wedges, which are arranged with their inclined surfaces in contact when the parts are assembled. By this construction and arrangement a frictional control is exerted on the coil or coils in direct proportion to the load or the pressure to which they are subjected." Peycke (No. 1,169,863—1924) for a spring arrangement shows combination of four coil springs with another type of frictional resistance spring arranged parallel thereto and between the several coils. The patentee described it as follows: "My invention relates to shock absorbing devices and has particular reference to a novel spring dampener in connection with the nest of springs commonly employed in car trucks." He used in connection with coil springs a split tube, the walls of which developed friction on the surfaces thereof independently of the coil springs whereby the action of the latter was dampened. And later Richardson (No. 1,601,190—1924, whose patent was issued after Hankins' application, but on a prior application) shows a combination of elliptic and coil springs in serial arrangement (that is, one superimposed on the other and not parallel) placed in the window of the side frame of freight cars. Claim 3 of the patent reads as follows: "In a railway car truck, the combination of a side frame having a bolster opening, a bolster mounted in said opening, coil springs upon which said bolster is mounted and elliptical spring members having frictional engagement with each other for increasing the snubbing action and upon which the said coil springs are mounted, said coil and elliptic springs having different periodicities for causing a differential action one upon the other for minimizing rocking of the car." In claim 1 of the same patent the springs other than the coil springs are described as "comprising frictional engaging members." And Gibbs (No. 488,474—1892) shows still another form of combination of coil with frictional resistance springs for railway cars in which claim 1 reads as follows: "A dampening mechanism for springs, consisting essentially of a plurality of flat friction plates lying face to face in planes parallel to the line of action of the spring, and a spring independent in its action of the movement of the parts and adapted to press and hold said plates together with the constant pressure, substantially as shown and described."

It is thus seen that the broad combination of coil springs with frictional resistance springs is old. And there is certainly nothing new in locating the springs in the window opening of the side frames, so that the axes of the springs fall within the marginal outline of the portion of the side frame forming the window opening. Such assemblies are shown in the Car Builders Dictionary for 1919 at pages 604, 608 and 1004. Nor did Hankins invent the use of disk or dished plates for springs. As early as 1867 Belleville (No. 64,790) described their use and advantages as an improvement for springs. He said:

"These disks are united in couples and are traversed in their center by a bolt. The couples are superposed one upon the other in sufficient number to attain the desired amount of elasticity. The disks are formed of metal of suitable elasticity and durability. The exterior diameter, the diameter of the center hole, their thickness, and their number in the composition of each spring are variable, according to the connection in which they are used and the resistance or pressure to which each spring is subjected. The conical form of the disks is such that they retain their elasticity or spring power until entirely compressed so as to have a plane form. They are then in contact one with another, throughout their entire surface, in such manner that the spring becomes a block of metal of considerable resistance. As the limit of the elasticity of the disks cannot thus be exceeded they cannot be broken by a sudden shock or blow."

It is said this type of springs was used on the highly efficient French 75 guns dur-

ing the World War. And Evans (No. 31,-793—1861) also showed a use of circular corrugated disk plates for the purpose of a stiff cushion spring. He said:

"The nature of my invention consists in forming springs of corrugated and conical or dish shaped plates, said corrugations being either radial or originating at or near the center of the plate and proceeding to the periphery in a voluted curve, each single plate being not more than 3/16 of an inch in thickness, and duplicating the same until the desired strength is obtained, as well as grading the diameter in combination with the thickness, whereby I obtain by the least weight of metal, the greatest amount of strength and an equality of elasticity."

His device was called a carriage spring but not specifically designed for railroad cars. See, also, German Patent to Krupp, No. 401,194.

There is also substance in the defendant's contention that the patent is invalid for the procedural reason mentioned unless it is given a narrow application. To understand this point requires an examination of the file wrapper of the plaintiff's patent showing what was originally applied for and the subsequent amendments in the specifications and claims.

██ United States Code, title 35, § 35 (35 USCA § 35), requires the applicant to make oath to the effect that he is the first inventor of the matter to be patented. And rule 48 of the Patent Office in effect requires that when new matter is brought in by the applicant during the progress of the proceeding in the Patent Office there shall be a supplementary oath by the inventor to the same effect. Accordingly it is generally held that a patent cannot be sustained when a new theory and method of application are introduced for the first time in unverified specifications, or where unverified claims are added for a different invention than that originally described, and thereby the scope of the original application has been broadened, although the new oath is not required where the scope is narrowed. Steward v. American Lava Co., 215 U. S. 161, 30 S. Ct. 46, 54 L. Ed. 139. The reason for the rule is clearly and succinctly explained by Circuit Judge Hough in Westinghouse Elec. & Mfg. Co. v. Metropolitan Elec. Mfg. Co. (C. C. A. 2) 290 F. 661. See, also, Cleveland Gas Burner & Appl. Co. v. American H. Corp. (C. C. A. 8) 38 F.(2d) 760, 763; Simpson v. Newport News S. & D. D. Co. (D. C. N.

Y.) 18 F.(2d) 318, 323, affirmed (C. C. A.) 18 F.(2d) 325; Dynamic Balancing Mach. Co. v. Akimoff (D. C. Pa.) 279 F. 285, 288; Powers-Kennedy Cont. Corp. v. Concrete Mixing & Conveying Co., 282 U. S. 175, 186, 51 S. Ct. 95, 75 L. Ed. 278; Rivise, Patent Applications (1933) § 241, etc. Compare Heller Bros. Co. v. Crucible Steel Co. (C. C. A. 3) 297 F. 39, 43; McCrady, Patent Off. Practice (1928) § 170.

In Chicago & N. W. R. Co. v. Sayles, 97 U. S. 554, 563, 24 L. Ed. 1053, the Supreme Court said:

"Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the mean time, gone into public use."

It will be found from the file wrapper of the plaintiff's patent that the situation here existing is not unlike that of Insulite Co. v. Reserve Supply Co., 60 F.(2d) 433, 435 (C. C. A. 8), where the patentee, two years and five months after his original application, very substantially amended the original claims (after a somewhat similar patent had in the meantime issued to another patentee), and where it was said:

"While it is permissible during the prosecution of an application for patent, to make amendments to the specifications and claims, yet these amendments must be directed to the same invention as originally disclosed, rather than to new matter. Obviously, a patentee should not be permitted, by filing an application for patent, to pre-empt the right to all conceivable inventions relative to the same general subject-matter."

In the present case the application for the plaintiff's patent was filed April 12, 1926. The claims were twice rather summarily rejected by the Examiner on the basis of the prior art. Thereafter, on May 8, 1928, interference was requested when it was discovered by plaintiff's patent solicitor, Mr. Mechlin, that under date of June 21, 1927, patent No. 1,633,011, had issued to Harry W. Frost covering a spring suspension device and embodying claims readable on the applicant's structure. Mr. Mechlin then made some minor amendments in the specifications and included the copying of several claims from the Frost Patent. The result of the interference proceeding (which was apparently carried to the Court of Customs

and Patent Appeals) was in favor of the Hankins application. Thereafter on October 29, 1931, Mr. Mechlin retired from the pending application and the present counsel for the plaintiff were substituted. Shortly thereafter, under date of November 6, 1931, quite extensive amendments were made in the specifications and all the former claims, with the exception of the three copied from Frost and allowed, were eliminated and new claims substituted. In the meantime the defendant's patent had been applied for on December 3, 1927, originally granted on September 10, 1929, and was subsequently reissued on November 24, 1931, on application for re-issue filed October 17, 1931; and defendant's car spring assemblies had been developed.

A comparison of the amendments to the original application, in the letter of plaintiff's solicitor dated November 6, 1931, to the Patent Office, with the original application will show the extent and character of the changes made. A reading of the application in its original form, embracing of course the specifications, the claims and the illustrative drawings, shows very clearly that what the applicant then had in mind was a combination of the ordinary coil springs with disk springs (that is, springs in the shape of a slightly dished plate) arranged in special formation, with respect to varying numbers of plates superimposed one on the other, some of the plates being arranged so that their centers were in contact, while others in the same series were arranged so that their peripheries or circumferences were in contact with each other. The drawings illustrated the different arrangements and combinations of the disk plates alone and the disk plates assembled in various formations either in parallel or in series with coil springs. No special emphasis was placed upon the location of the spring assembly wholly within the window opening as only one of the twelve figures of the drawings illustrated the location of the springs with respect to the car truck and that drawing showed only the disk springs without coil springs. However, it was apparently recognized that the spring assembly would be located within the window opening as that was common practice in the art and is referred to as "in the usual manner." It may also be noted that, prior to the extensive amendments just referred to, Mr. Mechlin, while still acting for the plaintiff, amended his application to more definitely show the intended location within the window opening. It is noteworthy that nowhere in the original application was any type of springs referred to with the exception of disk springs and coil springs which either separately or in combination are repeatedly mentioned throughout the whole application and are the only types of springs illustrated in the drawings. Thus the second paragraph of the original application read as follows:

"The primary object of the invention, generally stated, is to provide a spring unit adapted for location within the window of a truck in the usual manner and formed or arranged as a combination of disk and coil springs which will coact to give the proper resilience."

After stating the defects in operation of coil springs when used alone, it was added:

"It is with the above facts in view that I have designed the present invention which contemplates the employment of disk springs of novel construction and arrangement either alone or in combination with coil springs, the former being capable of providing or assuring resilience even though the latter lose their elasticity and become inert or dead. Another object of the invention, more specifically stated, is to provide a truck spring unit in which there may be employed a plurality of coil springs in combination with a single set or a corresponding number of sets of plate or disk springs arranged either in axial, concentric or circumferential relation. A still further object of the invention is a provision of a spring unit embodying plate or disk springs and provided with means engaging the springs whereby to prevent them from having any lateral movement, or displacement during service. An additional object of the invention is to provide a spring unit embodying plate or disk springs so arranged that the adjacent elements of alternate groups will have their central portions in direct engagement, the adjacent elements of the other alternate groups having their outer portions in direct engagement or contact."

The detailed references to the drawings throughout indicate and emphasize the applicant's thought that his invention involved the use of disk or plate springs. The original drawings have not been changed and in the patent as issued there have been few changes in the detailed references to the drawings.

The 25 claims in the original application also show the insistence on the use of disk

or plate springs and their special arrangement. Thus, for illustration, claim 5 which is typical in this respect reads as follows:

"In a unit of the character described, the combination with cap and bed plates, of an interposed spring member including groups of plates arranged in axial relation, the plates of successive groups being bowed in opposite directions with at least two of the plates of successive groups having their central portions in direct contact and their marginal portions spaced apart, means engaging the spring members for preventing relative lateral movement thereof, and means for limiting movement of said cap and bed plates, in one direction."

And the wording of the claims throughout in referring to springs members other than coil springs described them as "plates" or "superposed plate members" or as "bowed plates" or "groups of plates."

It is quite impossible to read the whole of the original application without conviction that the very essence of the invention claimed consisted of the use of disk or dished plate springs stacked in special relation to each other so that much greater resistance would result than could be furnished by coil springs.

The amendments of 1931 made many changes in the wording of the specifications as originally written, adding, or at least expressing, new ideas, and contained a complete re-writing of all the claims, and a literal broadening thereof. Thus in the specifications in many places the term "disk" or "disk or plate springs" has been changed to "disk or frictional resistance springs" and also in some of the claims. The second paragraph of the specifications was amended to read as follows:

"The primary object of the invention, generally stated, is to provide a spring unit or assembly adapted for location within the window or bolster opening of a truck side frame in the usual manner and formed or arranged as a combination of disk or frictional resistance and coil or live springs which will coact to give the proper resilience."

Again on page 1, beginning on line 65, the paragraph has been changed to read as follows:

"In the present invention there is also contemplated the employment of frictional resistance springs of novel construction and arrangement either alone or in combination with coil or live springs, the former having a period of vibration and being therefore capable of providing or insuring resilience even though the latter lose their elasticity and become inert or dead, the two kinds of springs being so associated and arranged that they may be readily placed within the window opening of a truck side frame, either as a replacement for a standard spring group or as a part of new construction."

On page 4, beginning line 51, a new paragraph is added to emphasize the parallel arrangement of the combined spring sets, and the residual nature of resistance of the stiffer disk springs is indicated in the concluding sentence—"An arrangement of the foregoing character possesses sufficient resiliency to insure easy riding qualities for a car, but absolutely prevents the application of harmful shocks to the side frame, rails and roadbed." And on the same page, line 70, there is still another new paragraph reading:

"It will be obvious that, under these conditions, the live or helical springs and the friction springs would be characterized by different periods of vibration which would necessarily result in a mutual damping action."

To the extent that the amendments emphasize the parallel arrangement of the coil and frictional resistance springs and the location thereof completely within the window frame, it may be said that the original claims are narrowed and therefore the departure would not have required a new oath. But while some of the claims, as for instance 6 and 16, include these limitations, they also by the substituted language in the description of the springs purport to expand the original claims (which quite clearly were intended to be limited to disk springs alone or in combination with coil springs) to include any type of frictional resistance springs. This term (frictional resistance) first made its appearance in this patent when Mr. Mechlin, still acting for Hankins, copied the claims from the Frost patent, in his request for an interference proceeding. In justifying the adoption of the claims using this phrase, for the Hankins application, he seems to have considered the term as synonymous with disk springs; but the present construction contended for by the plaintiff gives the phrase a wider application. The effect of the amendments in this respect is to expand the coverage of the patent application from the limited and *specific* form of resistance springs therein originally described (disk springs) to the *generic* form

which would include any kind of frictional resistance springs, and particularly the elliptical form. If disk and elliptical springs were similar in their theory and method of operation, the amendment would have been within the original conception of the invention, and no supplemental oath would have been necessary; but as will shortly be pointed out, the two types of spring operate quite differently, and with somewhat different results. Therefore, unless the generality of the language in the new claims is to be limited to the type of frictional resistance springs (that is, disk springs) illustrated in the drawings which remained unchanged in the patent application despite the amendments, there is force in the defendant's argument that the new matter, if so broadly construed as contended for by the plaintiff, should have been supported by supplemental oath of the inventor, which it did not contain. And to save the plaintiff's patent from this defect seems to require its limitation to the form of spring assembly clearly contemplated by the original application. It is significant that the drawings (which show only disk springs alone, or in combination with coil springs) were not changed with the amendments. As Judge Parker said for the court in Demco v. Doughnut Machine Corporation, 62 F.(2d) 23, 25 (C. C. A. 4): "It is elementary that the language of the claims is to be construed in the light of the specification and drawings."

There is still another reason why the plaintiff's patent should be given the narrow rather than the broad construction. While lack of commercial application does not of itself affect validity [Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 S. Ct. 748, 52 L. Ed. 1122; Smokador Mfg. Co. v. Tubular Products Co., 31 F.(2d) 255 (C. C. A. 2)], it furnishes sufficient reason for giving the patent a strict construction [Shipman v. Frank, 237 F. 395, 398 (D. C. Md., Rose, D. J.); National Malleable Castings Co. v. Buckeye Malleable Iron & Coupler Co., 171 F. 847, 853 (C. C. A. 6, Lurton, C. J.); Westinghouse Elec. & Mfg. Co. v. Toledo, P. C. & L. R. Co., 172 F. 371, 372 (C. C. A. 6); Boston Woven Hose & Rubber Co. v. Pennsylvania Rubber Co., 164 F. 557 (C. C. A. 1); Henry v. City of Los Angeles, 255 F. 769, 780 (C. C. A. 9); Deering v. Winona Harvester Co., 155 U. S. 286, 295, 15 S. Ct. 118, 39 L. Ed. 153; Walker on Patents (6th Ed.) § 233].

For these several reasons I reach the conclusion that the plaintiff's patent should not be broadly construed, and to save it from invalidity I think it must fairly be limited to an arrangement of disk springs within the window opening of a truck side frame, either with or without combination with coil springs. And so limited, this particular kind of spring assembly while it has not been put to actual test, would seem theoretically, by some of the testimony of competent spring experts, to be of probable substantial commercial value. Authority for the similar limited construction of patents is afforded by the cases in this Circuit of Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 40 F.(2d) 910, 914 (C. C. A. 4), and Demco v. Doughnut Machine Corporation (C. C. A.) 62 F.(2d) 23. In the latter case it was said [page 25 of 62 F.(2d)]:

"And, where necessary to uphold the validity of the patent, the court will construe even positive generic expressions as limited to the precise instrumentality disclosed by the patent."

See, also, Permutit Co. v. Graver Corp., 284 U. S. 52, 60, 52 S. Ct. 53, 76 L. Ed. 163.

*Infringement.* In my opinion the defendant's spring assembly does not infringe the plaintiff's patent as so construed. In general the combination of coil and elliptic springs is itself not new. Both types have been in common use separately and the prior art indicates that they have also been used in combination for railway car trucks, although the defendant says that the particular form of the application of the combination as covered by its patent is novel, as to which there is no occasion in this case to express an opinion. The defendant's patent is not for a spring assembly as such only, but is for an improvement in a "Truck for Railway Rolling Stock" where the spring assembly is only a part of the new construction described, the emphasis being apparently placed on features designed to strengthen the structure of the window opening, in which the spring assembly is located. And in describing the particular coil-elliptic spring assembly, attention is called to its theory or method of operation whereby the load of the car first engages the resistance of the elliptics and later the coils, so that the energy absorption of the latter is reserved for unusual shocks, in contrast to the theory of operation of the plaintiff's spring assembly, where the residual capacity to resist excessive stresses is apparently chiefly intended to be placed on the disk springs.

If the defendant's patent, by reason of its reissue date, is to be taken as later than

the plaintiff's patent, it is true that it is not in itself prima. facie evidence of non-infringement, but only of patentable difference.. Freeman v. Altvater, 66 F.(2d) 506, 512 (C. C. A. 8). But what was said by Circuit Judge Denison in Herman v. Youngstown Car Mfg. Co. (C. C. A.) 191 F. 579, 585, is here applicable:

"As the necessary result of the fundamental principles, it seems that the existence of the later patent can have no tendency to disprove infringement, unless, for other reasons, we have first reached the conclusion that the earlier patent is, as to the later structure, specific, and not generic. If we have reached that conclusion and the correlative conclusion that the earlier patent is entitled only to a narrow range of equivalents, and if we find that the claims of the later patent embody no improvement feature whatever, we will then find our conclusion fortified by the Patent Office declaration that the two structures are different species of the same genus; but, before we can so interpret the Patent Office action, we must have given to the earlier patent a construction which will of itself probably determine the question of infringement, and it is difficult to see how in deciding the underlying question material aid can be had from such Patent Office declaration."

It is apparent on inspection that the defendant's coil-elliptic arrangement is different in form and appearance from the plaintiff's device, but more importantly the principle and result of operation of the coil-elliptic is different from that of the stacked disks. It is doubtless true that both spring assemblies have some characteristics in common. Thus both the elliptics and the disks are in a general sense frictional resistance springs and both have some dampening effect on the vibrations of the coils, and it is possible to so arrange disks and coils, in size, thickness and relation that they would not function materially differently from some coil-elliptic combinations, but the essential feature of the disks as originally described by Hankins is in such special arrangement that they are capable of acting as a very stiff

spring resistance to withstand excessive shocks *after* the capacity of the coils has been exhausted, while the elliptics, as indicated in the defendant's patent, preferably are arranged to take the initial stress, with the capacity of the coils held in reserve, and also the elliptics, in operation jointly with the coils, by their different period of vibration, tend to check the amplitude of vibration which would result from the coils alone. The coil elliptic, however, lacks the peculiar capacity of the coil-disk combination which consists in the powerful residual capacity of the disks when stacked in the way indicated in the drawings (especially fig. 6) of the Hankins patent, which seems to be its only patentable novelty. This feature of the plaintiff's patent is well brought out in the testimony of the witnesses, Gurney and Wood, testifying for the plaintiff in rebuttal. The plotted curve of resistance of the disk springs as explained by Gurney is clearly illustrative. On these considerations it cannot be fairly said that the defendant infringes on the doctrine of substantial equivalents, even though the patentee may bring the defendant's device within the letter of the plaintiff's claims. Boyden Power-Brake Co. v. Westinghouse, 170 U. S. 537, 568, 18 S. Ct. 707, 42 L. Ed. 1136; Anakin Lock Works v. Dillon Lock Works, 292 F. 45 (C. C. A. 8); Skelton v. Baldwin Tool Works, 58 F.(2d) 221, 225, 227 (C. C. A. 4); Sanitary Refrig. Co. v. Winters, 280 U. S. 30, 42, 50 S. Ct. 9, 74 L. Ed. 147. And apart from this view of the matter, it would seem the plaintiff is not entitled to enjoin the defendant from using a spring combination that is itself old in the art. Chisholm-Ryder v. Buck (D. C.) 1 F. Supp. 268, 281; Id., 65 F.(2d) 735 (C. C. A. 4).

The final conclusion of law is that the plaintiff's bill must be dismissed, with taxable court costs to be allowed the defendant. Counsel may present a decree accordingly. I assume the findings of fact and law herein given will be regarded as substantial compliance with Equity Rule 70½ (28 USCA § 723), but if more detailed findings consistent herewith are desired, they may be submitted.