**FROST RY. SUPPLY CO. v. T. H. SYMINGTON & SON, Inc.**

**No. 2520.**

District Court, D. Maryland.

July 11, 1938.

Brown & Brune and Charles Ruzicka, all of Baltimore, Md., and Archworth Martin, of Pittsburgh, Pa., for plaintiff.

Piper, Carey & Hall and John W. Avirett, 2d, all of Baltimore, Md., and Ritter, Mechlin & Muir and Gilbert P. Ritter, Ernest F. Mechlin, and Henry K. Muir, all of Washington, D. C., for defendant.

CHESNUT, District Judge.

In its bill in equity in this case the plaintiff is seeking a decree of court under the Federal Declaratory Judgment Act, 28 U.S.C. § 400, 28 U.S.C.A. § 400, to determine the rights, obligations and duties of itself and of the defendant respectively under a written contract between them dated September 11, 1931, relating to a license and royalty payments under United States Patent to C. Hankins issued January 12, 1932, No. 1840506, for a railway car spring mechanism. The fundamental issue in the controversy relates to the proper construction of this contract but the question thereby raised emerges from a background of patent law. At the time the contract was made the parties were engaged in an interference litigation in the Patent Office in which the defendant's patent had been determined to have priority of invention over the plaintiff's patent by the Board of Appeals in the Patent Office, from whose decision the plaintiff had taken an appeal to the Court of Customs and Patent Appeals. While the case was there pending

the parties entered into a brief and informal agreement of settlement which constitutes the contract involved in the case, whereby the plaintiff withdrew its patent appeal, the defendant's patent was permitted to issue without further opposition, the defendant agreed to give the plaintiff a license under the patent, and the plaintiff agreed to pay to the defendant a royalty for a certain structure made by the plaintiff in the past and in the future, during the life of defendant's patent or until it was "over-ruled in Courts", the defendant also agreeing to "uphold our patent rights against all other people who infringe".

Since the making of the contract on September 11, 1931, the plaintiff has continued to make and sell the licensed device but has paid no royalties although the defendant from time to time has demanded them. The plaintiff has taken the position that its obligation to pay royalties under the contract did not arise until *after* the defendant had successfully established its patent rights by infringement suits, and now finally, after further formal demand by the defendant that the plaintiff pay the back royalties, the plaintiff has filed this suit asking a decree to the effect that the contract is null and void and imposed no obligation on it in the past or for the future. This position is directly controverted in the defendant's answer which also sets up a counter-claim which seeks specific performance of the contract, and in the alternative, if the contract is not enforceable, then an injunction against and accounting by the plaintiff for patent infringement; but at the recent trial of the case the counter-claim was not pressed. The only question which is now presented is whether the plaintiff is indebted to the defendant for royalties accruing under the contract heretofore, and if so, whether the contract has now been terminated by the effect of the decision of this court on February 8, 1935 in the patent infringement suit of T. H. Symington & Son, Inc. (the defendant in the present case) v. Symington Company, 9 F.Supp. 699, from the decree in which case the plaintiff therein did not appeal. That case involved the validity and scope of the Hankins patent above referred to. In the opinion in the case the patent was not held invalid but was given a narrow construction. The plaintiff in this case contends that the decision in effect "overruled" the patent within the meaning of the license contract between the parties to this case.

The jurisdiction of the court is based on diverse citizenship, the plaintiff being a corporation of the State of Michigan and the defendant, a corporation of the State of Maryland. From the pleadings and testimony in the case I find the following facts, no material part of which is really disputed. About the year 1925 the railway car industry in the United States became impressed with the large amount of breakage in railway car truck springs, those then in common use being principally of the ordinary simple helical coil variety. During the next few years efforts were made to obviate this difficulty by various devices intended to improve the spring assembly for railway car trucks, and some of them were patented. The plaintiff was engaged in this activity and on June 14, 1926, its president, Harry W. Frost, filed an application for a patent for a new form of spring assembly and the patent therefor was issued June 21, 1927, No. 1633011. But prior thereto on January 24, 1925, Cyrus Hankins had also filed a patent application for a car truck spring assembly; and after the issuance of the Frost patent Hankins copied claims 1, 2 and 5 of the Frost patent and added them to his patent application, which resulted in the Patent Office declaring an interference between the two on June 28, 1928, with the result that in due course in the interference proceeding Hankins was adjudged to be the prior inventor of the subject matter of the particular claims, and this decision was affirmed by the Board of Appeals in the Patent Office, from which Frost appealed to the Court of Customs and Patent Appeals. While the case was so pending the parties made the informal written agreement of September 11, 1931 (constituting the contract involved in this case) which was as follows:

"September 11th, 1931.

"Mr. Harry W. Frost, President,

Frost Railway Supply Company,

Union Guardian Building,

Detroit, Michigan.

"Dear Sir: Referring to our conference this date, I will make you the following proposition:

"1. You withdraw your appeal on our present patent suit on spring.

"2. We let our patent come to issue.

"3. As soon as this patent comes to issue, we will give you a full and complete license under our patent to sell the Frost Friction Spring for car truck purposes.

"4. You will sign a contract to pay us a royalty of twenty-five (25¢) cents per spring unit on all springs that have heretofore been put in service and on all future springs sold and applied.

"5. We will uphold our patent rights against all other people who infringe.

"6. This contract to be good for the life of our patent, provided, of course, our patent is not over-ruled in Courts, in which event the contract terminates.

"Very truly yours,

"T. H. Symington, President

"Accepted:

"Frost Railway Supply Company

"By Harry W. Frost, President."

The defendant in this case, T. H. Symington & Son, Inc., was the owner as assignee of the Hankins patent. Mr. Thomas H. Symington, who had for many years been actively engaged in the railway car supply business, was the president and active executive of the defendant corporation. About a week after the making of this agreement of September 11, 1931, Mr. Thomas H. Symington suddenly and unexpectedly died. Shortly before his death he wrote to Mr. Frost (on September 12, 1931) making some specific suggestions for the improvement of the Frost truck spring; and on September 25, 1931 Mr. Frost wrote to Mr. Drenning, vice-president of T. H. Symington & Son, Inc., expressing great regret at Mr. Symington's death and some uncertainty as to whether the Symington Company would continue to be active in business and would continue its interest in the Frost device. Mr. Drenning replied re-assuring Mr. Frost in this respect; and, shortly after the Hankins patent was issued, on February 8, 1932, Mr. Thomas R. Symington, son of Mr. Thomas H. Symington, went to Detroit to discuss the issuance of the license to Frost. Frost then took the position that under the contract no royalties would be due and payable until *after* the defendant corporation had successfully prosecuted infringement suits under the Hankins patent. The defendant directly disagreed with this interpretation of the contract although expressing its willingness to prosecute suits against infringers.

Unfortunately a few days after this conference in Detroit, Mr. Thomas R. Symington suffered severe injuries in an automobile accident from which he was incapacitated for about a year; and Mr. Drenning, vice-president of the defendant, also had a long hospitalization which incapacitated him for business. But on May 14, 1933 Mr. Drenning revived the matter of the contract and requested performance by Frost who reiterated the plaintiff's position as to the contract and demanded that infringers, including the Symington Company (a corporation engaged in business principally in New York and separate and distinct from T. H. Symington & Son, Inc.), the Cardwell Company and the Miner Company should be sued as infringers under the Hankins patent to eliminate certain competition from these latter Companies which Frost asserted he was encountering. Mr. Drenning refused to accede to the interpretation of the contract but promised to proceed against the Symington Company as an infringer, and Frost insisted that no settlement should be made between the two Symington Companies but the suit should be prosecuted to a finish.

Shortly thereafter on September 27, 1933, T. H. Symington & Son, Inc., brought a patent infringement suit against the Symington Company in this court which resulted in a decree for the defendant on the ground that the Hankins patent, when construed in the light of the prior art, was limited, if valid, to the particular form of combined *disk* and coil springs disclosed in the patent application, and so construed, the Symington Company's combination of *coil and elliptic* springs did not infringe. From this decree T. H. Symington & Son, Inc., did not appeal, and nothing further appears to have transpired between the parties to this case until on October 19, 1937, the defendant herein formally demanded performance by the plaintiff of its contractual obligation and tendered a formal license agreement and demanded a statement of the number of Frost spring devices which had been sold and the payment of the royalty due thereon, with notice of suit within ten days if the demand was not complied with. This resulted in the filing of the present suit on November 4, 1937.

 Coming now to the law of the case, the plaintiff has advanced the view, but without emphasis thereon, that the agreement of September 11, 1931 shows on its face that it was too tentative and informal to constitute a binding obligation. But this contention is obviously not tenable. While brief and informal, the agreement was suf-

ficient to define the relationship of the parties to the patents in controversy. It afforded the basis for present action and was in fact partly promptly acted on by the parties. The plaintiff dismissed its appeal to the Court of Customs and Patent Appeals and in due course thereafter the defendant's patent was issued. And promptly thereafter the defendant offered the formal license agreement and requested the payment of the royalties. Without compliance therewith the plaintiff continued to make and sell its friction spring for car truck purposes without interference from the defendant. And the correspondence which ensued between the parties immediately after the making of the agreement indicates that both regarded it as then presently effective. It seems quite clear that the agreement constituted in legal effect a sufficient license to the plaintiff. See De Forest Radio Telephone & Telegraph Co. v. United States, 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625; Finley v. Asphalt Co., 8 Cir., 69 F.2d 498. And the fact that a more formal license and royalty contract was contemplated did not deprive the agreement of present legal efficacy. A.L.I. Restatement of Contracts, § 26, p. 33; Finley v. Asphalt Pav. Co., 8 Cir., 69 F.2d 498, 505; American Paper Bag Co. v. Van Nortwick, 7 Cir., 52 F. 752, 757.

The more seriously pressed, and the main contention of the plaintiff, is that the agreement has never imposed on it the obligation to pay any royalties, either past or future because (1) the successful maintenance of patent infringement suits by the defendant was a condition precedent to the payment of any royalties by the plaintiff, and (2) the unsuccessful prosecution by the defendant of the patent infringement suit against the Symington Company (T. H. Symington & Son, Inc., v. Symington Co., D.C., 9 F.Supp. 699) terminated any contractual liability.

■ I am unable to accede to the plaintiff's contention that the successful prosecution of patent infringement suits was a *condition precedent* to the obligation to pay *any* royalties under the agreement. The contract did not in terms so provide, and a brief reference to the situation of the parties at the time of making the agreement will show that this is not a reasonable construction of the contract. The Patent Office, both on original holding and on appeal therefrom, had determined the interference proceeding between plaintiff's and defendant's patents in favor of the defendant. The plaintiff's situation therefore was that unless the decision was reversed on appeal to the Court of Customs and Patent Appeals, it would be subject to an infringement suit by the defendant to enjoin future production of the Frost friction spring, and presumably the railroads which had installed that equipment in the past and were then using it would also be subject to suit; and if such suits were brought the plaintiff would obviously be seriously embarrassed unless it could in the courts obtain a different decision with respect to the patents from that which had been given in the Patent Office. As a result of the agreement, plaintiff was relieved from any such embarrassment by obtaining from the defendant "a full and complete license under our patent to sell the Frost Friction Spring for car truck purposes"; and the defendant has enjoyed the benefit of this license without repudiation thereof until the recent filing of the present suit. The contract between the parties was to last for the life of the defendant's patent unless it was sooner "over-ruled" in the courts; and while the agreement provided that the defendant would sue "other" infringers of its patent, there was of course no legal certainty that there would be any such infringers to sue during the life of the patent. It is obvious that if there were no "other" infringements of the defendant's patent, the plaintiff, according to its construction of the contract, would have enjoyed a license for the life of the patent to sell its device without ever being called upon to pay any royalty at all. Furthermore the agreement expressly provided that the license was to be given "as soon as this patent comes to issue"; and the defendant was (inferentially contemporaneously therewith) to pay a royalty "on all springs sold and applied". If the parties had intended that successful infringement suits were to be a condition precedent to the payment of any royalties, it seems probable, in view of the great importance of the condition, that it would have been much more clearly and definitely expressed in the contract; and in that event there would have been no necessity for the sixth and final stipulation as to the termination of the contract, which was obviously a *condition subsequent*.

It is evident that the plaintiff obtained immediate and valuable benefits under the

agreement and continued to enjoy them for several years thereafter, and at least until the decision in the infringement suit between the two Symington Companies. Nor was there an unreasonable delay by the defendant in bringing an infringement suit, under the circumstances; certainly no such delay as suggests bad faith, or an intention to wilfully delay the issue. It is true that the plaintiff complained that it was being subjected to competition by infringers, but it did not suggest a rescission of the agreement or offer to surrender the license. See Martin v. New Trinidad Lake Asphalt Co., D.C., 255 F. 93; Lathrop v. Rice & Adams Corp., D.C., 17 F.Supp. 622, 628; Schutte & Koerting Co. v. Wheeler Condenser & Engineering Co., D.C., 295 F. 158. On the contrary it affirmed the agreement and demanded action thereunder by the other party. Based on an untenable construction, it took a position which in effect gave it all the advantages of the contract if the infringement suit was successful, and relieved it from all obligations if unsuccessful. I therefore hold as a conclusion of law that the agreement between the parties was legally effective from its date and imposed the obligation on the plaintiff to pay royalties at least until the decree of this court adverse to the defendant. See Drackett Chemical Co. v. Chamberlain Co., 6 Cir., 63 F.2d 853, 854.

There is, however, more force in the plaintiff's other contention, that the contract has been terminated and the obligation to pay royalties thereunder ended, as a result of the patent infringement suit in this court. By the contract the defendant stipulated, as a consideration moving to the plaintiff, that—

"5. We will *uphold our patent rights* against all *other people* who *infringe*.

"6. This contract to be good for the life of our patent, provided, of course, our patent is not *over-ruled* in Courts, in which event the contract terminates." (Italics supplied.)

The italicized words in these quoted provisions of the agreement are not sufficiently clear and definite to be without necessity for construction in the light of the surrounding circumstances. The plaintiff contends that the proper construction shows that the intention of the parties was that the plaintiff should be afforded "reasonable patent protection" against competing car springs by successful patent infringement suits; and if these did not result successfully in eliminating such competition then the contract and the obligation to pay royalties terminated. In this connection the pivotal word requiring construction is the proper meaning of the word "overruled" in its context. It will be noted that the parties used the word "overruled" rather than the more definite one "invalidated". Defendant contends that the narrower meaning of "invalidated" should be given to "overruled" in the context. The result of the T. H. Symington & Son, Inc., v. Symington Co. Case, was not to invalidate the Hankins patent, but to limit it by a narrow construction to the particular form of combined coil and *disk* springs disclosed in the patent application. The plaintiff's view is that the decision in effect "overruled" the defendant's patent within the meaning of the contract interpreted in the light of the circumstances.

To properly decide between the respective constructions some more detailed reference must now be made to the original patent controversy between the parties. As previously stated, the Frost patent No. 1633011, issued June 21, 1927. In the application it was stated: "The invention relates to spring suspensions for railway cars and has for its object the obtaining of a construction which will absorb a portion of the energy of shocks and will check oscillations which unrestrained might become dangerous. It is a further object to obtain such results with a simple and inexpensive construction as hereinafter set forth". It is said that the Patent Office must have inadvertently allowed the Frost patent to be issued because at the time there was also pending in the Patent Office an application from Hankins filed January 24, 1925 relating to the same general subject matter. In Hankins' application it is said: "The invention relates to springs for use in connection with the trucks of railway or other cars. The primary object of the invention, generally stated, is to provide a spring unit or assembly adapted for location within the window or bolster opening of a truck side frame in the usual manner and formed or arranged as a combination of disk or frictional resistance and coil or live springs which will coact to give the proper resilience". After the issuance of the Frost patent Hankins copied its claims 1, 2 and 5, which ultimately became claims 1, 2 and 3 of Hankins' patent when issued after the interference proceeding.

(The parties have agreed that, for the purposes of this case, the other claims of the patents need not be considered). Claim No. 2 which was common to both patents and which was specifically considered in T. H. Symington & Son, Inc., v. Symington Co., D.C., 9 F.Supp. 699, 702, read as follows: "A spring suspension for railway cars, comprising top and bottom follower plates, a plurality of freely movable helical springs interposed between said plates and distributed about the area thereof and one or more frictional resistance springs, all of said springs acting in unison."

The function and principles of mechanical operation of railway .car springs was discussed at some length in the Symington Case and it will not be necessary here to repeat what was there said or to further discuss in detail the particular differences between Frost and Hankins and the coil elliptic springs, which were held not an infringement of the Hankins patent. It is sufficient to say that all of them, as well as some others of a generally similar nature particularly referred to in the testimony in this case as Cardwell and Miner, had the same general objective, to prevent spring breakage and permit easier riding; and all of them included some device or mechanism which involved a combination of one or more coil springs with one or more frictional resistance springs or at least frictional action of the spring proper with other parts of the whole assembly. The Frost device took the form (much more readily understood from the small model offered in evidence than from the drawings in the patent) of a frictional resistance spring, as one member of a group of springs, consisting of an ordinary coil spring on which was *superimposed an overlapping and closely fitting outer coil* in several pieces which, on compression generated considerable friction between the inner and outer coil. The specifications and drawings of the Hankins patent disclosed a spring assembly consisting of several ordinary coils arranged principally in parallel relation to a set of *disks* or plate springs. Both devices operated on the principle that the frictional spring members of the assembly were capable of a very high residual capacity to absorb severe inertial stresses in movement, thus preventing an amplitude of travel or oscillation sufficient to cause the spring assembly to be fully compressed or deadened; while on the other hand a characteristic principle of operation of the coil

elliptic and the Cardwell and Miner devices was to prevent extended oscillation by interference with the periodicity of vibration, rather than affording the assembly high residual spring capacity. The common mechanical principle in all was, however, *frictional resistance* between members of component parts of the spring assembly. In the Frost, Hankins and coil elliptic devices the friction was developed between parts of the spring proper while in the Miner and Cardwell devices, referred to in the plaintiff's testimony as competing devices, the friction was developed not between parts of the spring proper but between the coil spring and other parts of the assembly such as blocks or plates.

Reverting now to the language in claim 2 of the Frost and Hankins patents it is apparent upon analysis that the claim in essence consisted only of a combination of ordinary coil springs "and one or more frictional resistance springs, all of said springs acting in unison". It was evidently the view of the Patent Office that this claim accurately described or read upon the Frost and Hankins spring structures although they were of quite different physical construction. If, therefore, the claim as allowed by the Patent Office, despite its very great generality, was literally valid it was obvious that the Frost device, after the issuance of the Hankins patent, would infringe; and it is fairly inferable from the subsequent correspondence between the parties that the view was common to both that the coil elliptic device used by the New York Symington Company (which was furnishing the greatest competition to Frost), and possibly also the Cardwell and Miner devices, should be regarded as infringements of the Hankins patent. Certainly the plaintiff advanced this view and made claim and demand upon the defendant to sue such competitive devices as infringements; and the defendant accepted the view at least to the extent of assenting that it clearly was its duty under the contract to sue the coil elliptic spring as an infringement. That is to say, it appears from the circumstances of the case that when the parties in their contract stipulated that the defendant as owner of the Hankins patent would *"uphold our patent rights against all other people* who *infringe"*, it was their common understanding that the patent rights referred to were broad enough to include the legal right to enjoin such devices as the coil elliptic (when it subse-

quently came into competition with Frost), as well as the Frost device, except for the license as to the latter. The effect of T. H. Symington & Son, Inc., v. Symington Co., D.C., 9 F.Supp. 699, was in substance to overrule this mutual conception of the defendant's patent rights because, while the patent was not held invalid in that case, it was limited in scope to the particular combination of coil and disk or plate springs disclosed in the patent drawings and specifications, and thus was not validly broad enough to warrant an injunction against another particular form of combined coil and frictional resistance springs, such as the coil-elliptic combination.. And it would seem to necessarily follow from the principle of the decision in T. H. Symington & Son, Inc., v. Symington Co., supra, that the Miner and Cardwell devices in which the frictional resistance results not from the spring itself but from other parts of the whole assembly could not properly be enjoined as infringement.. In this connection it is not without significance that the defendant in this case did not appeal from the adverse decree in T. H. Symington & Son, Inc., v. Symington Co., supra; and has brought no other patent infringement suit against makers of other similar spring devices; and indeed made no further demand upon the plaintiff here for payment of royalties under the agreement until October 19, 1937, an unexplained delay of nearly three years.

■ Counsel for the defendant here urges the view that the adverse decision in T. H. Symington & Son, Inc., v. Symington Co., supra, does not necessarily establish in principle that the Frost device is not an infringement of the Hankins patent. It is urged that the precise mechanical principle of operation of the Frost and Hankins springs is similar although the devices take separate and different physical forms, and that this common principle is somewhat different in mechanical operation from the coil elliptic combination. And the well-known doctrine of substantial equivalents (Hartford-Empire Co. v. Swindell Bros., 4 Cir., 96 F.2d 227; Hoeltke v. Kemp Manufacturing Co., 4 Cir., 80 F.2d 912) is forcibly invoked in favor of Hankins as against Frost. But the contention is not sustainable within the principle of the decision in T. H. Symington & Son, Inc., v. Symington Co., supra, where, after a review of the prior art and also on procedural grounds, it was held in this court that the

Hankins patent if valid at all must be limited to the particular form disclosed in the application which, of course, is quite different from the Frost device. The question now is not so much whether that decision was intrinsically correct, but rather what effect did the decision as made have on the contractual relations of the parties, the case not having been appealed, and no other infringement suits having been prosecuted by the defendant.

■ In considering the case I have not overlooked the well established rule of patent law that a licensee under a patent may not defeat a claim for stipulated royalties by disputing the validity of the patent, unless he first unequivocally surrenders the license, or is substantially evicted from the enjoyment thereof as a result of a judicial determination of invalidity in other patent litigation; or by merely showing impairment of benefits from unauthorized competition where there has been no guaranty against it. Walker on Patents, 6th ed. s. 355; St. Paul Plow-Works v. Starling, 140 U.S. 184, 11 S.Ct. 803, 35 L.Ed. 404; United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492; White Co. v. Converse & Co., 2 Cir., 20 F.2d 311, 313; Ross v. Fuller & Warren Co., C.C., 105 F. 510; Martin v. New Trinidad Lake Asphalt Co., D.C., 255 F. 93; Sea Gull Specialty Co. v. Humphrey,. 5 Cir., 242 F. 271; Schutte & Koerting Co. v. Wheeler Condenser & Engineering Co., D.C., 295 F.·158; Lathrop v. Rice & Adams Corp., D.C., 17 F. Supp. 622; Newport News Shipbuilding & Dry Dock Co. v. Sherwood, 4 Cir., 5 F.2d 924, 932.

■ The plaintiff's broad contention is that the contract impliedly, if not expressly, guaranteed it against patent infringement competition, and that as a result of the unsuccessful infringement suit and the failure of the defendant to bring others, it has been evicted in substance from the enjoyment of the license. This contention is not without force, but the sounder view, I think, is to put the decision on the particular wording of the contract. The precise legal problem is to determine what the parties mutually intended by the particular words they used interpreted in the light of their relations and the surrounding circumstances. So viewed, I reach the conclusion of law, for the reasons already stated, that the contract between the parties terminated upon the decision in T. H. Symington & Son,

28

Inc., v. Symington Co., supra, in February 1935.

The result of the construction of the whole contract is that the defendant is entitled to royalties from the plaintiff at the contract rate for the Frost friction car springs sold or put in service by the plaintiff prior to February 8, 1935, but for none thereafter sold or put in service.

The bill of the plaintiff for declaratory judgment in this case prays for an order (a) that the contract is null and void and of no force and effect; (b) that the Frost spring device is not covered by the Hankins patent; (c) that the Hankins patent is invalid; (d) that the defendant be enjoined from prosecuting any claims against the plaintiff with respect to the latter's spring structures of the type in controversy; (e) that the plaintiff has the right to make and sell its car springs in the future without interference from the defendant and (f) for taxable court costs. In accordance with the findings of fact and conclusions of law contained in the above opinion, counsel may prepare an order or decree to the effect that (1) the contract between the parties dated September 11, 1931, was of legal force and effect between the parties from its date until February 8, 1935; (2) that said contract terminated February 8, 1935; (3) that the plaintiff is not entitled to enjoin the defendant from prosecuting its claims or demands for royalties accrued under the agreement up to February 8, 1935; (4) that the plaintiff was and is entitled to make and sell its type of car springs after February 8, 1935, without payment of royalties to the defendant; (5) that the Frost spring device is not covered by the Hankins patent; and (6) that no taxable court costs be awarded for or against either party in the case.

The order or decree so to be drawn should not contain any provision to the effect that the Hankins Patent No. 1840506 is invalid, as the defendant did not proceed in the trial of the case on its counterclaim and the issue as to the validity of the Hankins patent does not necessarily arise on the plaintiff's case; and I understand this view is not disputed by plaintiff's counsel.

I may add that neither party has raised any question as to the propriety of the procedure in this case under the Federal Declaratory Judgment Act, 28 U.S.C. § 400, 28 U.S.C.A. § 400.